# SUPREME COURT,
## STATE OF KANSAS.

## JULY TERM, 1911.

### PRESENT:

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. CLARK A. SMITH,
Hon. SILAS W. PORTER,      } Justices.
Hon. ALFRED W. BENSON,
Hon. JUDSON S. WEST,

ALICE C. WINGFIELD, *Appellant,* v. J. C. McCLINTOCK
*et al., Appellees.*

No. 16,836.

#### SYLLABUS BY THE COURT.

1. DEMURRER—*Evidence—Conflicting Testimony.* On the trial of a case, where there is conflicting evidence on the one hand tending to establish a material fact, and on the other to disprove it, it is error for the court to sustain a demurrer to the evidence, however strongly in the opinion of the court the preponderance of the evidence may be against the party on whom rests the burden of the issues.

2. EVIDENCE — *Experiments — Illustration of a Fact in Issue.* Evidence of experiments offered as an illustration of a fact in issue, which experiments are taken under widely different conditions from the facts sought to be illustrated, are not admissible in evidence.

Appeal from Geary district court. Opinion filed February 11, 1911. Affirmed in part and reversed in part.

*G. W. Hurd*, and *J. V. Humphrey*, for the appellant.

*George H. Whitcomb, Clad Hamilton, Clyde Taylor, Kersey Coats Reed*, and *J. C. Rosenberger*, for appellees J. C. McClintock and William F. Bowen.

*W. S. Roark*, for appellee L. R. King.

The opinion of the court was delivered by

SMITH, J.: This action was brought by the appellant to recover damages from the appellees by reason of their alleged negligence and unskillfulness in performing a surgical operation upon Jesse B. Wingfield, the appellant's deceased husband, which resulted, as alleged, in the death of Jesse B. Wingfield. The appellant introduced her evidence and the appellees demurred thereto, which demurrer was sustained by the court, and judgment was rendered against the appellant for costs. This was the principal error assigned. The only other assignment of error is in the rulings of the court excluding the testimony of one Heckelman, an expert in X-ray photography, and plates produced by him for the purpose of illustration.

The uncontroverted facts seem to be, in substance, that the deceased was a farmer, and resided about fifteen miles from Junction City; that on the 3d of October, 1908, he worked in the field, apparently in good health; that the evening of that day he spent at a neighbor's, and came home late at night and to some extent under the influence of intoxicating liquor; that he went to bed and slept until sometime after midnight, when he awakened and missed his upper set of false teeth, and declared that he had swallowed them—that they were sticking in his throat—and caused appellee Doctor King, who lived in Junction City, to be sent for; that the doctor arrived in the early morning of October 4, and after being told by Wingfield that he had swallowed his teeth and they were lodged in his throat the doctor examined the throat, by inserting his

Wingfield v. McClintock.

finger, and said he felt the teeth, that they were in such a position that he could not get them, and that the patient would have to come to town the next day; that soon thereafter the doctor returned to Junction City, and not long thereafter the deceased, with his daughter, followed him, arriving at Junction City about twelve o'clock of that day, and remaining in the doctor's office from that time until about six o'clock in the evening. The deceased drank and breathed without apparent difficulty, and walked about. In the evening Doctor King examined Wingfield's throat with an X-ray machine and said he saw the teeth, but that he could not take them out; that the best thing to do was to take him to a hospital; that they would take him to Topeka, where they would have better means to take care of that; that Doctor McClintock had an X-ray apparatus in his office, the best in Kansas, which they would use and find out the exact position of the teeth before they commenced to operate; that the doctor telephoned Doctor McClintock at Topeka, told him that he had a patient that required an operation, and that he wanted to bring him on the early morning train; that early the next morning the doctor and the deceased, with his daughter, took the train and rode in a chair car to Topeka, a distance of about seventy-five miles, and the deceased talked with his daughter all the way.

On arriving at Topeka they took a street car, transferred from one car to another, walking about half a block, got off near the hospital, and walked a block thereto. After arriving at the hospital the deceased walked out on the porch and smoked and talked, had no paroxysms of his throat, did not attempt to vomit, and seemed to breathe and talk easily. Doctor King introduced the daughter to Doctors McClintock, Bowen and Kiene, told them that she was the daughter of the man they brought to operate on, and said to them: "This man is in bad shape." He also inquired if they wanted to examine him. Doctor McClintock replied that he

14—85 KAN.

did not suppose it was necessary to examine him again, if he (King) had examined him the day before. Doctor King said that he had looked at it with an X-ray and made an examination. Thereupon they took Wingfield, in company with his daughter, into the operating room, placed him on a table and administered an anæsthetic, and thereafter Doctor McClintock took a probe and inserted it into the patient's throat, through his mouth, and remarked: "I can feel nothing." Thereafter, without further examination, the surgeons cut into the neck and through the esophagus, then again used the probe through the cut and through the mouth, and said they could not find the teeth and would have to cut further down. They then cut into the stomach, and again inserted the probe in the opening at the neck and brought it out at the stomach, without finding the teeth. Doctor McClintock said: "The teeth are not here. If you will look in the room where he slept last night you will find them." They then sewed up the wounds. The patient remained in the hospital until the following Friday morning, when he died.

Thereafter, Doctor Yates, assisted by Doctor Keith, and in the presence of Doctors Bowen, Mulvane, Kiene and Amis, made a post-mortem examination of the body from the throat to the rectum, and found no false teeth lodged therein.

There is conflict in the evidence of expert witnesses called, of whom there were a number; but there was testimony to the effect that it would not conform to the standard of skill and care commonly exercised by surgeons of ordinary skill and learning in such cities as Topeka and Junction City to perform an operation which involved cutting into the esophagus of a person for the purpose of extracting a full upper set of false teeth supposed to be in the esophagus, without first definitely and certainly ascertaining by means of the X-ray that the set of false teeth for which the operation was being performed was lodged in the esophagus as supposed; also that there are two means of ascer-

taining whether such a set of teeth are lodged in the esophagus without cutting into it—one by the olive-tipped probe and the other by means of the X-ray; also, that the presence or absence of a set of false teeth composed of vulcanized rubber and porcelain, such as these in question were, could be discovered in any part of the throat or esophagus by the use of the X-ray with absolute certainty, and if in the stomach could, in the same way, be determined whether they were there. There was also evidence that it would not conform to such ordinary standard of skill and care in such cities, if a surgeon were informed that an X-ray examination had disclosed the presence of the teeth in the esophagus nearly twenty-four hours before an operation, to operate upon the esophagus therefor without an examination to discover whether they were still in the esophagus. There was also evidence that the administering of the anæsthetic and the operation upon the throat and the stomach superinduced acute nephritis, which resulted in the death, and that the cause of the death was the result of the administering of the anæsthetic and the operation.

It is contended on behalf of Doctor King that he relied upon his examination of the throat on the evening before the patient was brought to Topeka, but there is evidence that he did not rely upon such examination, but said that they would bring the patient to Doctor McClintock, who had the best X-ray apparatus in the state, and they would definitely locate the teeth before operating.

It is argued on behalf of Doctor McClintock that he had a right to, and did, rely upon the statement of Doctor King that he had made an X-ray examination and located the teeth in the esophagus the day before; but there is evidence that he did not rely upon this statement, but that he himself, before the operation, probed the throat with an olive-tipped probe and did not discover the teeth; and there is evidence that this

method would certainly determine whether the teeth were or were not in the esophagus.

We think this conflicting evidence presented an issue of fact for the determination of the jury, which should not have been determined upon the demurrer to the evidence.

It is also argued that the patient repeatedly declared that he had swallowed his teeth, and said to Doctor King that if he did not cut them out he (the patient) would go elsewhere and have them cut out; and that Doctor McClintock was informed of this declaration, and was employed only to perform the operation. It is said that the trial judge based his ruling upon the evidence of such statements by the patient, as showing that the patient himself induced the operation and justified the surgeons in relying thereon and performing the operation.

Again, it may be said that the surgeons did not depend upon the statements of the patient, but did examine for themselves. The examination made by Doctor King satisfied him that the teeth were in the esophagus, as claimed by the patient, but the examination made by Doctor McClintock, in the presence of Doctor King, demonstrated positively, if the evidence for the appellant be taken as true, that the teeth were not in the esophagus, and, inferentially, that if the teeth were in the body at all they must have descended into the stomach, and that the use of the X-ray would have disclosed whether or not they were in the stomach. At any rate there is a question whether the misapprehension of the patient or the failure to exercise care on the part of the surgeons, if there was such failure, was the proximate cause of the operations upon the patient. This is a question of fact for the determination of the jury.

Considerable argument is made in the briefs of the appellees upon the degree of care and skill legally required of physicians and surgeons. We do not deem it necessary to discuss this question. If the evidence

of the appellant be taken as true, as it must be as against a demurrer thereto, the surgeons proceeded to operate upon the neck of the patient after they had demonstrated that the teeth were not in the esophagus, and upon the stomach without investigation, when they could have definitely determined whether or not the teeth were there without an operation.

The appellant also complains that evidence of an X-ray shadow picture, taken by placing under a dead body a set of false teeth, composed of porcelain teeth set in gutta-percha, being a view taken from the opposite of the body, was rejected by the court as evidence in illustration of what might have been disclosed by an X-ray examination upon the living patient. Evidence of experiments tried under the same or very similar conditions have been recognized as admissible. If the court regarded the condition under which the X-ray picture was taken to be such that it would not demonstrate whether a like picture of the neck or stomach of the living patient would disclose the presence or absence of the teeth, the exclusion of such exhibit could not have influenced the ruling on the demurrer. As the case is likely to be tried again, we should, perhaps, say that it is a matter of common knowledge that the presence of an opaque object in the human body may be discovered by the X-ray process, if no other opaque substance intervenes; yet, as the shadow picture may be greatly changed by different positions of the body with reference to the instrument, and by other conditions, and may be misleading instead of instructive, it devolves upon the court to allow the introduction of only such experimental evidence as clearly appears to be an aid to the jury in determining the fact in issue. From the preliminary evidence presented it does not appear that the court erred in the ruling.

As to appellee Doctor Bowen there seems to be no evidence that he was employed in the operation or

that he took any part therein, except as a spectator, and the ruling of the court upon the evidence and the judgment thereon as to him is affirmed. As to appellees McClintock and King we think there was evidence that should have been submitted to the determination of the jury, and the judgment as to them is reversed.

BURCH, J. (dissenting) : Doctors King and McClintock could be convicted of malpractice only upon expert testimony that their conduct was improper under all the facts and circumstances, and the precise facts and circumstances, under which they acted. No questions of this kind were propounded or answered. Consequently there was nothing upon which the jury could rest a verdict.