ANTONIO LEONE, Respondent, *v.* BOOTH STEAMSHIP COMPANY,
LTD., Appellant.

Second Department, November 7, 1919.

Ships and shipping — negligence — injury to seaman on voyage —
failure to send plaintiff to shore hospital — evidence not estab-
lishing negligence of defendant — judicial notice.

Action to recover for personal injuries received by the plaintiff who was
employed by the defendant steamship company as an able seaman and
who, while at sea, fell from a mast. It appeared that the fall of the
plaintiff caused a dislocation of the bones of the shoulder and also a slight
fracture of the large tuberosity of the humerus of the plaintiff's arm, which
latter injury was not definitely discovered by the ship's doctor who treated
the plaintiff in the hospital of the ship. The plaintiff testified that as
he continued to suffer pain he had requested the ship's doctor and officers
to send him to a hospital for treatment at various ports which the vessel
made, but that his requests had been refused. The only issue submitted
to the jury was as to whether, in view of the fact that the injury was not
cured, it was the duty of those in charge of the ship to have sent the
plaintiff to a hospital for examination when in port, and it was further
charged that no liability could be predicated upon the alleged incompetency
of the ship's doctor who was a physician of age and experience. On all

Second Department, November, 1919.    [Vol. 189.

the evidence, *held*, that it was error for the court to submit the question as to the defendant's liability for negligence arising through the failure of those in charge of the ship to send the plaintiff to a shore hospital, there being nothing to show that had he been sent ashore he would have received other or different treatment from that given him by the ship's doctor.

There being no proof that the hospitals of the ports at which the ship touched had X-ray apparatus which would have brought about a discovery of the fracture in the plaintiff's humerus, the court will not take judicial notice of the fact that said hospitals have such apparatus.

Moreover it was error to permit the jury to decide that the hospitals aforesaid had X-ray apparatus, or that, if the plaintiff had been sent there, he would have received any different treatment from that given him by the ship's doctor.

If the ship's doctor was competent, as was shown, and the apparatus and facilities of the ship's hospital were sufficient, the defendant is not liable, there being no evidence of improper treatment by the doctor.

Defendant cannot be held in damages because the captain of the vessel did not overrule the instructions of the physician.

APPEAL by the defendant, Booth Steamship Company, Ltd., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 4th day of February, 1919, upon the verdict of a jury for $2,500, and also from an order entered in said clerk's office on the 14th day of February, 1919, denying defendant's motion for a new trial made upon the minutes.

The plaintiff, respondent, was employed as an able seaman on board the steamship *Boniface,* owned by defendant, and on February 4, 1916, three days after she sailed from New York, while he was engaged in assisting in the work of raising the wireless apparatus in place, he fell from the foremast of the vessel and received severe injuries. He was carried to the ship's hospital where he was treated by the ship's doctor.

There are two causes of action alleged in the complaint. In the first cause of action it is set forth that the mast was not properly equipped with ladders, ropes, guards and other devices, and was an unsafe and unseaworthy appliance, but upon the trial there was no evidence of defective appliances and equipment and the court dismissed the first cause of action.

In the second cause of action the plaintiff alleges the duty of the defendant, owner of the steamship, after the accident, to furnish the plaintiff, a sailor, with proper care in the way

of medical and surgical treatment such as the plaintiff's injuries required, and it is alleged that defendant failed and neglected to furnish such treatment, and that while the plaintiff was in a crippled and helpless condition the master of the vessel compelled him to perform his regular duties as a sailor and other hard and manual labor. And plaintiff charges that the physician employed on the steamship was incompetent and that he did not treat plaintiff properly, and that " said physician was not equipped with proper tools, instruments, etc., for the treatment of plaintiff's injuries."

The plaintiff charges that the ship's doctor failed to properly diagnose his injuries, in that he failed to discover a fracture of the large tuberosity of the humerus of plaintiff's right arm. Plaintiff testifies that his complaints to the doctor and to the master of the vessel and requests that he be sent to a hospital at one of the ports at which the vessel called were refused and that he was compelled to work despite the fact that he was at all times suffering severe pain. He testifies that the doctor and the master accused him of malingering. When the steamship returned to Brooklyn on April 22, 1916, some eleven weeks after the accident, plaintiff was sent to the Long Island College Hospital, where by use of the X-ray the fracture was discovered and, after operation, healed. Plaintiff was relieved to some extent, but he claims that the arm is permanently disabled.

According to the testimony, the first port at which the vessel touched after the accident was " Barbadoes." Barbadoes is not a port, but is an island. The port of Barbadoes is Bridgetown. The plaintiff claims that he desired to go ashore for hospital treatment at this port but that he was not permitted to do so. He testifies that the doctor said he would take him ashore at Barbadoes and have an X-ray taken of his shoulder. When the vessel arrived six days after the accident, the plaintiff testifies that he was waiting in the ship's hospital to be taken ashore but that the mate told him the doctor had examined him when he was sleeping, and that the captain said to him, " There is no necessity to send you in a hospital, there is nothing the matter with you, they won't take you in the hospital." He testifies that the ship's doctor told him at that time that there

was nothing the matter with him. The ship was at " Barbadoes " about twenty hours. The plaintiff says that he had been ashore at this place at previous times and that Barbadoes is a city as large as Brooklyn and that there are plenty of hospitals and doctors there. The next port at which the vessel touched was Para, in Brazil. Plaintiff says they have many hospitals there and that he said to the captain: " Will you send me to a hospital in Para? " The captain said, " You try there, yes." The plaintiff testified that he went ashore and to the office of the British consul. While at the office, he says the mate came to him with the captain and the vice-consul. The vice-consul said to the captain: " Is this the man you are talking about? " and the captain answered, " Yes, this is the man, * * * happened an accident, and we treated him right." " Then," says the plaintiff, " the consul told me, ' You better go aboard, no hospital here, you will die of sickness, you go back aboard and they will treat you right.' I said, ' they put me in the forecastle.' I said, ' I can't live in the forecastle without treatment; and after that they put me to work, I am sure.' He said, ' They won't put you to work, you better go back aboard,' and I went back aboard the ship." Subsequently the vessel touched at different ports in Brazil. Plaintiff testifies that these are small ports but that they have hospitals. The captain never at any time called a shore doctor to examine him or sent him to a hospital. Plaintiff claims he repeatedly requested that he be sent to a hospital. He claims also that he was obliged to work about the ship, causing him additional pain and suffering.

The captain and mate of the vessel and the ship's doctor denied that plaintiff was treated improperly. The doctor, forty years of age, had some fourteen years' experience as a physician and surgeon in various hospitals, and had been engaged for several years in general practice. He testifies that he found a dislocation of plaintiff's right shoulder joint; that plaintiff refused to allow any examination of the injury at the time of the accident, but that on the following day he put the shoulder joint in place, and immobilized the joint and arm by bandages. He says he suspected that there might be a fracture of one of the tuberosities on the humerus,

but he says the plaintiff would not allow examination. He says the fracture of the tuberosity subsequently developed by the X-ray photograph at the Long Island College Hospital, was a small fracture, the separation of a small part of the bone about the size of his finger nail, a separation of about one-sixteenth or one-eighth of an inch and that if he had been positive that there was such a fracture the treatment would have been the same, that is, immobilization and bandaging. The defendant's witnesses testified that the plaintiff was kept in the ship's hospital for two weeks, and then sent to his quarters in the forecastle with his arm bandaged; that he was not forced to work at any time, that light work and gradual use of the arm were proper and necessary, but that at no time was the plaintiff forced to work against his will, and that on any complaint of pain he was allowed to lay off work. The defendant's witnesses testify that the plaintiff was a troublesome patient, resenting any attempt to examine the injury, and that on one occasion at Manaos in Brazil, after his removal from the ship's hospital, he, with sailors, members of the crew, obtained liquor from the shore contrary to the regulations and became intoxicated and violent. The doctor testified that he did not know whether there was any X-ray apparatus at any of the hospitals in the ports at which the vessel called — and that the treatment given the plaintiff in the ship's hospital was the same as would have been given at any other hospital. There was no X-ray apparatus on the ship, but the evidence is that the hospital was in every other respect fully equipped.

After plaintiff's treatment at the Long Island College Hospital, he consulted counsel, and was sent to the New York Hospital where he was examined by a doctor who did not treat him, but who testified in his behalf. This physician says, from an examination of the X-ray photograph, that it would have been possible to discover the condition of the broken tuberosity without the use of an X-ray. He said in answer to questions of plaintiff's counsel, which did not state any hypothetical facts or conditions, that treatment for such a fracture should be to immobilize the arm " in external rotation," by turning the arm out, and that this should be followed by massage and baking. No proper hypothetical

question was addressed to the witness by the plaintiff, reciting the conditions or facts as stated by him concerning his injury or treatment, nor was he asked to testify whether the treatment of plaintiff as related by him was or was not the ordinary treatment in such cases. He testified that it was absolutely necessary to have the co-operation of the patient. The ship's doctor, for the defendant, testified in rebuttal that his treatment was proper under the conditions existing in plaintiff's case.

The trial justice said: " The only question I will submit to the jury is this: Whether in view of the fact that the injury did not become cured, or, in other words, in view of the fact that the man did not get well within a reasonable time, or did not improve within a reasonable time, whether, in view of all the circumstances in this case, it was the duty of those in charge of the steamship to have sent him to a hospital either at Barbadoes or in South America, to be examined, so as to determine, if possible, what was the condition of his shoulder or arm at this time. I shall tell the jury that there can be no liability predicated here upon the failure of the ship to employ a competent physician, because the testimony here shows that there was a competent physician on board. I shall tell the jury that no liability can be predicated upon the fact that the doctor may or may not have made a wrong diagnosis of the case. I shall only submit to them the question as to whether or not those in charge of the ship acted prudently in not sending this man to a hospital in one of those ports." And in his charge to the jury he said: " I have taken away from you the first cause of action, which alleges negligence on the part of the steamship company in sending this man aloft to do some work, and I have taken away from you any question as to whether or not the doctor was guilty of what we know as malpractice, in other words, a failure to properly diagnose and treat this case, because the doctor is, according to the testimony, a duly qualified physician, a man of some experience, of middle age, or past, and was thoroughly competent to discharge his duties as a physician on board this vessel. So that no liability can be predicated here for anything which the doctor did in his failure to properly diagnose or treat this case. So we come down to this one proposition, and that is the only point which you may consider in this case: Should

those in charge of this vessel, acting as reasonably prudent men, have sent this man to a hospital in Barbadoes, or in one of the South American ports, for the purpose of having his condition diagnosed, so that they might be able to properly treat him? " Again the court charged the jury: " So in this case concededly this man asked the captain at Barbadoes if he might go to a hospital. The question for you to deter- mine is whether or not the captain acted as a reasonably prudent man in not sending this man to the hospital at Barba- does, or when they got to South America. The testimony shows that this ship made half a dozen calls at different ports in Brazil, and the plaintiff claims that he then requested to be sent to a hospital. At any rate he did not go to the hospital. And it is assigned here as a reason for not sending him to the hospital that the British consul advised, in one instance, that it would be extremely dangerous for him to remain in that port. Upon all the testimony it comes back to the proposition which I laid down to you before: Did those in charge of the ship discharge their full duty towards this plaintiff? If you find that they did, that ends the case, and your verdict would be for the defendant."

The counsel for the defendant excepted to the charge as to the possibility that the jury might find from any evidence in the case that there was an X-ray machine at Barbadoes.

Counsel for the defendant made the following request: " I ask your Honor to charge that the ship's officers may fairly be entitled to conform their conduct touching any medical or surgical question, or the work this man was doing, to the instructions of Dr. Dynan." The court said: " I so charge."

*Henry M. Hewitt*, for the appellant.

*Silas B. Axtell*, for the respondent.

KELLY, J.:

We all agree that upon the evidence in the record the learned trial justice erred in submitting to the jury the question whether the defendant was liable for negligence because those in charge of the ship did not send the plaintiff to a hospital at Barbadoes, or at one of the ports in South America at which the vessel called. There is nothing in the case to show that if

plaintiff had been sent ashore he would have or should have received other or different treatment from that given him by the ship's doctor. The evidence as to the location of hospitals at Barbadoes or the other ports mentioned by the plaintiff, is of little probative value, nor is there any evidence, if there were hospitals at these ports of call, that they had any better or different facilities for treating the plaintiff than those found in the ship's hospital, which on the evidence was supplied with the usual appliances, instruments and apparatus found upon a modern passenger steamship. It is true that there was no X-ray apparatus on the ship, but there is no suggestion in the case that such apparatus is used or can be used on a vessel such as the defendant's steamship, nor is there evidence that there was X-ray apparatus at the hospitals in the southern ports. The plaintiff's knowledge of conditions in these West Indian and South American ports is evidently meagre. He testifies, for instance, that he had been ashore at " Barbadoes " at other times. That it is a " big city." " It is as big as Brooklyn is. I don't know Brooklyn — * * *. They got plenty hospitals, certainly, and doctors." We know that Barbadoes is not a city but an island, the port is Bridgetown. The population of Bridgetown is stated in the International Encyclopedia to be from 30,000 to 35,000, while the population of the entire island of Barbadoes in 1913 is stated to be 197,792. The Encyclopedia Britannica gives the population of Bridgetown as 23,000. These encyclopedias mention the fact that there is a hospital at Bridgetown, but give no details as to its capacity or equipment. The plaintiff argues that the trial court might take judicial notice that X-ray apparatus was in general use in hospitals at Bridgetown and in South American ports (citing *Field* v. *Empire Case Goods Co.,* 179 App. Div. 253; *Powell* v. *Hill,* 170 N. Y. Supp. 915; *Rochester & C. Turnpike Road Co.* v. *Joel,* 41 App. Div. 43). But none of these cases is applicable to the facts here. " Courts are not bound to take judicial notice of matters of fact. Whether they will do so or not depends on the nature of the subject, the issue involved and the apparent justice of the case. The rule that permits a court to do so is of practical value in the law of appeal, where the evidence is clearly insufficient to support the judgment. In such case judicial notice may be taken of facts which are a

part of the general knowledge of the country, and which are generally known and have been duly authenticated in repositories of facts open to all, and especially so of facts of official, scientific or historical character." (*Hunter* v. *N. Y., O. & W. R. R. Co.*, 116 N. Y. 615.) In *Robinson* v. *Insurance Co. of North America* (198 N. Y. 523) the Court of Appeals, expressing some doubt whether a trial judge might take judicial notice of the harbors and location thereof within his district, said that even if such judicial notice might be taken of the location of the harbors, the condition prevailing in the harbor at a given time presents a question of fact. In *Town of North Hempstead* v. *Gregory* (53 App. Div. 350) this court had before it the question whether judicial notice might be taken of conditions prevailing in one of the harbors on Long Island as to ice and the effect thereof upon docks and piers in such harbor, and Mr. Justice JENKS, writing for the court, discussed the subject and collated the authorities. He said in part: " In *Brown* v. *Piper* " (91 U. S. 37) " the court further say: ' This power is to be exercised by courts with caution. Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative.' * * * Phillips, in his book on Evidence, states as a further principle that the matters within judicial notice are generally collateral to and unconnected with the point in issue, so that to dispense with strict proof is of no risk, while to require it might be inconvenient by reason of expense or of difficulty."

The medical expert called by the plaintiff testified that the fracture of the tuberosity might be determined without use of the X-ray. He says that he ascertains this condition in the majority of cases without any X-ray, and that an operation is not necessary to cure or remedy such a condition, as most patients get well without it. He says that his treatment of such a fracture would have been to " immobilize the arm in external rotation," which he explains is to turn the arm out and keep it immobilized in that position for three or four weeks. He also testifies that it is absolutely necessary to have the cooperation of the patient. But his testimony, at the most, is that he might have used a different method of treatment

from that adopted by the ship's doctor in immobilizing plaintiff's arm, and it is difficult, on the record, to perceive what the difference is. He did not criticize the treatment given plaintiff by the ship's doctor, nor was he asked to express any opinion as to whether it was the usual treatment in such cases or whether it was proper or improper. No question was framed or presented to plaintiff's medical witness, containing a statement of the facts of the case as claimed by the plaintiff's evidence, asking the expert's opinion as to the treatment of plaintiff by the ship's doctor. We think that upon the evidence in this case it was error to permit the jury to decide as a matter of common knowledge that the hospital in Bridgetown possessed an X-ray apparatus or that if the plaintiff had been sent there he would have received any different treatment from that given him.

But upon the law of the case, as charged by the learned trial justice without objection or exception by the plaintiff, I think there was no evidence justifying the submission of the case to the jury, and that defendant's motion at the close of the testimony for nonsuit should have been granted. The complaint alleged that the ship's doctor was incompetent and that the treatment of the plaintiff was improper. There was no evidence in the case that he was incompetent and the trial judge charged the jury without objection or exception that the ship's doctor was " a duly qualified physician, a man of some experience, of middle age, or past, and was thoroughly competent to discharge his duties as a physician on board this vessel. So that no liability can be predicated here for anything which the doctor did in his failure to properly diagnose or treat this case." The medical witness called by the plaintiff was not asked whether the diagnosis or treatment of plaintiff by the ship's doctor was proper or improper or whether it was or was not the usual and customary treatment in such cases. If there had been evidence of malpractice coupled with plaintiff's testimony as to his complaints to the master of the ship, denied by the defendant's witnesses, an issue might have been presented for the jury. But if the ship's doctor was competent, and the appliances and facilities in the ship's hospital were sufficient, the defendant was not liable. " The question to be determined was a medical one, the advice of a competent

physician was sought and followed, and the ship's officers should not be held negligent because they followed his advice * * *. The ship's officers might fairly be entitled to conform their conduct touching any medical or surgical question to the instructions of men thus qualified to decide it " (*The Sarnia,* 147 Fed. Rep. 106, 108, C. C. A., Second Circuit); and in *Allan* v. *State Steamship Co.* (132 N. Y. 91, 99) the Court of Appeals, in discussing the duty of a vessel owner to provide medical care and treatment for passengers, said: " When the shipowner has employed a competent physician duly qualified as required by the law and has placed in his charge a supply of medicines sufficient in quantity and quality for the purposes required which meet the approval of the government officials and has furnished to the physician a proper place in which to keep them, we think it has performed its duty to its passengers. That from that time the responsible person is the physician, and errors and mistakes occurring in the use of the medicines are not chargeable to the shipowner and that no different rule is applicable to such mistakes as are the result of improper arrangement in the care of the medicines than to those which are the result of errors in judgment. The work which the physician does after the vessel starts on the voyage is his and not the shipowner's." And the court said: " Any other construction must assume that the shipowner is bound to exercise some supervision over the physician in his treatment of the passengers and his arrangement of the medicine. But no officer on the ship is competent to do that." (Citing *Laubheim* v. *De K. N. S. Co.,* 107 N. Y. 229, and *O'Brien* v. *Cunard S. S. Co.,* 154 Mass. 272.) In the case at bar, there being no evidence of incompetency on the part of the ship's doctor or improper treatment, the defendant cannot be held in damages because the captain of the vessel did not overrule the instructions of the physician. I think no issue was presented for submission to the jury and that the judgment and order appealed from should be reversed, with costs, and the complaint dismissed, with costs.

JENKS, P. J., MILLS, RICH and JAYCOX, JJ., concurred.

Judgment and order reversed, with costs, and complaint unanimously dismissed, with costs.