James v. Grigsby.

---

No. 24,637.

J. B. JAMES, *Appellee*, v. C. E. GRIGSBY, *Appellant*.

SYLLABUS BY THE COURT.

PHYSICIAN AND SURGEON—*Malpractice—Negligence—Damages—Evidence—Instructions*. In an action for damages for malpractice, the evidence examined, and held sufficient to go to the jury; the instructions examined and held not so erroneous as to require a reversal.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed November 10, 1923. Affirmed.

*Chester Stevens,* of Independence, for the appellant.

*W. R. Hobbs, S. H. Piper,* and *W. B. Grant,* all of Independence, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages for malpractice. It was tried to a jury which made findings of fact and returned a general verdict for plaintiff. The defendant has appealed.

Appellant's main contention is that the court should have sustained his demurrer to the evidence which makes it necessary for us to examine the evidence offered by plaintiff in chief.

The plaintiff, a man fifty-eight years old, was living on a farm with his mother, eighty-one years of age. On May 31, 1920, he met with an accident in which the femur of his left leg was broken about three inches above the knee. It was an oblique fracture. The defendant was called to treat plaintiff and undertook to do so. He reached the home of plaintiff about three-quarters of an hour after the accident and with the aid of two neighbors set the broken bone. He made two splints out of boards, wrapped them with cotton, put one on the outside of the leg and one on the inside and bound them with tape. He wanted to take plaintiff to the hospital but plaintiff did not want to go. He put plaintiff to bed and hung a weight to his foot. On June 2 defendant visited plaintiff and again urged him to go to the hospital; said, "You'll be down there where I can take care of you a good deal better. You'll have good treatment there," and plaintiff consented. Defendant had an ambulance take him to the hospital, a distance of about four and a half miles over roads that were hilly. At the hospital he was put to bed in a room where there were three other patients, one of whom, Davy Schile, was being treated by defendant for a broken leg. The defendant came into the room soon after the plaintiff reached the hospital and put a weight—a sack of sand—on his foot but made no examination of the fractured leg and did nothing for it, though plaintiff was suffering pain. Defendant saw plaintiff every two or three days while he was at the hospital but made no examination of his leg and did nothing for it on any of these occasions. On one occasion, while he was at the hospital, the defendant said he had taken an X-ray picture of Davy Schile's leg (there was an X-ray machine in the hospital) and plaintiff asked defendant to take an X-ray picture of his leg and defendant replied, "We don't need an X-ray picture of your leg. We know your leg is all right." Plaintiff remained in the hospital until June 27, at which time he wanted to go home and de-

James v. Grigsby.

fendant consented. During that time the splints which had been placed on his leg at first had never been removed or adjusted. On that day defendant removed the splints and bandages, examined the leg and pronounced it all right, bathed it in alcohol and put the splints back on. The leg felt better to plaintiff and he thought it was all right and told the defendant so. At that time he couldn't stand up. He was taken home in an automobile, carried into the house and put to bed, where he was confined for several weeks. On July 15 defendant visited him, removed the bandages and examined the leg. It looked crooked and plaintiff spoke to defendant about it and defendant said, "Yes, it is a little bit, but that little bit won't hurt you." Defendant put a plaster of Paris cast on the leg and told plaintiff he was going away for a month on a vacation; that the plaster of Paris cast might hurt him and if it did to take his knife and cut it off, "You know how I did Davy's leg," and put the splints back on. The plaster of Paris cast did hurt plaintiff and after leaving it on about eight days he cut it off and he and his sister put the splints back on. Plaintiff's sister took him in a buggy to see defendant at his office after his return from his vacation and talked with him about his leg. Defendant did nothing for his leg at that time, but said, "Now, your leg is all right. All you need is just a little time." Plaintiff went with Fred George to defendant's office again in about two weeks and told defendant that he didn't think his leg was all right; that he thought something was wrong with it. Defendant came up and grabbed hold of the leg and said he couldn't see anything wrong with it. "It is all right. You just don't get in too big a hurry." That was about three and a half months after the accident. He saw the doctor at his office about two weeks afterward. He was then using crutches. The doctor again told him his leg was all right; that he was in too big a hurry and that he should go home and be still and that he would get all right. At that time the doctor examined his leg but did not give any prescription. He saw the doctor again in January, 1921, at his office and he told the doctor that he could rent a little place if he was going to be able to do anything. The doctor told him that was the best thing that he could do; that he could not plow all day, of course, that he would have to stop and rest, but that he could do "right smart." Plaintiff rented the place but was unable to do any work. When he tried to walk on his leg it would not hold him up, was not strong enough. The leg was not

straight. His knee would fly out of place, first one way and then the other. He had not been able to get around without crutches. He had suffered pain more or less since it was broken. He tried to hoe in the garden but had to hop around on one foot.

Dr. W. C. Chaney, a physician who had been engaged in the practice of medicine at Independence for more than nineteen years and for the last three and one-half years had been specializing in X-ray, on August 17, 1921, took two X-ray pictures of plaintiff's left femur, one a front view, the other a side view. The pictures were offered in evidence. These showed that the break was a long, diagonal break; that the ends of the bone overlapped something over an inch, —an inch and one-eighth to an inch and a quarter—and that the leg was not straight, being out of alignment ten to twelve degrees. He identified Figure 224 in Gray's Anatomy, a standard authority, as a fair likeness of the femur in its natural state and this was offered in evidence. The doctor testified that the X-ray was used in diagnosing many conditions and is used and perhaps has been used longer in diagnosing fractures or bone conditions. Under general conditions when a patient who has sustained a fractured bone arrives at the hospital it would be a proper practice to make an X-ray examination. "Of course, it was always the proper thing to take an X-ray, of course. I think that a doctor would want to take an X-ray of it if the hospital was equipped with an X-ray machine." That the purpose in taking an X-ray of the fracture is to see that the bone is properly set in good apposition and good alignment. He was asked: "Q. Well, would you call it negligent practice if he did not take an X-ray picture? A. Have to know about the circumstances. Don't think any doctor could give a thorough answer to that question unless he knew something of the circumstances of the case." He then testified that if a man's leg was broken and he was his patient and brought to a hospital that was equipped with an X-ray machine, his practice would be to take the X-ray of it from the two angles, if it was possible at all to get it, and that he would consider that the proper practice in Montgomery county, and further said that wooden splints or plaster of Paris casts would not interfere with the taking of the photograph, "and we could still get an outline of the bone very clearly" even with some metal splints. That in his practice he had sometimes got good results and at times had poor results, which he regarded as unavoidable. That in a man fifty-

eight or nine years of age the fracture would heal much slower than in a younger person, but that they can get a good union and do in a majority of cases. There is frequently a shortening of the length of the leg, but not always, and as a rule in older people the breaking of the femur results in a slight shortening. It would not be unusual for a man, say fifty-eight years of age, having an oblique fracture of the femur, to have a shortening of the leg anywhere from an inch to an inch and a quarter, and that sometimes results when a patient has had good treatment. That shortening is the result of the muscular contraction of the large muscles that extend from the pelvic region to the knee and around to and below the knee. He had not measured the plaintiff's leg to determine how much, if any, shortening there was. He further testified that it was possible to set an oblique fracture and not have any shortening at all; that the open method of treating broken bones, in which they open down to the bone, lay back the periosteum, bring the bones together and fasten them with bone splints, or otherwise, is called "bone surgery" and of late years it has been the usual practice, after taking an X-ray of an oblique fracture, to treat them by the open method and fasten the ends together by some of the means which he described.

Dr. W. J. Gier, a physician of Independence, who had been in the practice of medicine for five years in that county, testified as follows:

"Q. Now, Doctor, if a man should sustain a fracture of the left femur three and a half inches above the knee and after the fracture had been reduced at his home, four days afterwards, he was removed to the hospital, where there was an X-ray machine, tell the jury whether or not you would consider it skillful or unskillful practice if the doctor in charge of his case failed to take an X-ray picture of the fracture? A. I would consider it proper to take his X-ray picture. In fact where it is accessible, I should consider it negligence not to take it."

The foregoing is the substance of plaintiff's evidence and the question is, should defendant's demurrer thereto have been sustained?

The legal questions pertinent to this inquiry have been quite definitely settled by repeated adjudication. The relation between a physician or surgeon and his patient, implied in law, is that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in

the community where he practices or similar communities, having due regard for the advance in medical or surgical science at the time, and that he will use such learning and skill in his treatment of the patient with ordinary care and diligence. (*Tefft v. Wilcox,* 6 Kan. 46; *Branner v. Stormónt,* 9 Kan. 51; Elwell on Malpractice, 63; *English v. Free,* 205 Pa. St. 624; *Van Boskirk v. Pinto,* 99 Neb. 164.)

In case of doubt as to which of two or more courses is to be pursued, he must use his best judgment. (*Paulich v. Nipple,* 104 Kan. 801, 180 Pac. 771.) He does not guarantee good results, and no civil liability arises merely from bad results (*Tefft v. Wilcox,* 6 Kan. 46; *Paulich v. Nipple,* 104 Kan. 801, 180 Pac. 771; *McGraw v. Kerr,* 23 Colo. App. 163; *Haire v. Reese,* 7 Phila. Rep. 138; *Sims v. Parker,* 41 Ill. App. 284; *Champion v. Keith,* 17 Okla. 204), nor if bad results are due to some cause other than his treatment. (*Pettigrew v. Lewis,* 46 Kan. 78, 26 Pac. 458.) But where he fails to possess ordinary learning and skill or fails to use ordinary care and diligence, and injury results therefrom, he is liable for the injury to the patient in a civil action for damages. (*Petefish v. Morrison,* 110 Kan. 709, 205 Pac. 651; *Forman v. Surber,* 113 Kan. 42, 213 Pac. 667.) These principles apply to diagnosis as well as to treatment thereafter. (*Manser v. Collins,* 69 Kan. 290, 76 Pac. 851.)

What is the proper treatment to be used in a particular case is a medical question to be testified to by physicians as expert witnesses; laymen, even jurors and courts, are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be handled. (*Pettigrew v. Lewis,* 46 Kan. 78, 26 Pac. 458; *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881; *Stout v. Bowers,* 97 Kan. 33, 35, 154 Pac. 259; *Paulich v. Nipple,* 104 Kan. 801, 180 Pac. 771; *Snearly v. McCarthy,* 180 Iowa, 81; *Berkholz v. Benepe,* 190 N. W. 800 [Minn.].) Results, if so pronounced as to be apparent, may be testified to by anyone. (*Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.) And where negligence in the treatment is shown by medical witnesses and the evidence shows a bad result, it is the province of the jury to say whether the result was caused by the negligence. (*Nickerson v. Gerrish,* 114 Maine, 354; *Viita v. Fleming,* 132 Minn. 128; *Knopp v. Thornton,* 250 S. W. 853, [Ky.]; *Wojciechowski v. Coryell,* 217 S. W. 638 [Mo.]; *Leone v. Booth S. S. Co.,* 178 N. Y. Supp. 620; *Hoover v. McCormick,* 247 S. W. 718 [Ky.]; *Berkholz v. Benepe,* 190 N. W. 800 [Minn.].) Many other authorities might be cited on the above propositions.

In considering a demurrer to evidence the court should take into consideration only those facts and inferences of facts which are favorable to plaintiff. (*Can Co. v. Ross,* 72 Kan. 669, 83 Pac. 616; *Travis v. Simpson,* 106 Kan. 323, 187 Pac. 684; *Rosenfeld Co. v. Gleed,* 110 Kan. 75, 202 Pac. 611.)

Applying these settled principles of law to the evidence, no question is raised that the defendant did not possess the requisite learning and skill. There is nothing to indicate that the method used in setting the broken leg at the farm was improper. The evidence showed that the proper practice, and hence ordinary care and diligence required, when plaintiff was brought to the hospital where there was an X-ray machine, an X-ray picture should have been taken, in fact, two should have been taken, one front view and one side view. The medical evidence would indicate that the X-ray had been used so long and so generally in diagnosing fractures or bone conditions and for the purpose of seeing if a fractured bone had been properly set and the ends of the bone were in apposition and proper alignment, that it should be used as a matter of course when available, and not to use it under such circumstances is negligence. The X-ray was not used, though available. The evidence further tends to show that if used it would have shown the actual condition of the fracture; the jury had before them X-ray pictures taken later which demonstrated how clearly such pictures show the condition of a fractured bone. The evidence further tended to show that the proper practice, which, in the advanced stage of medical science had been in general use in Montgomery county for several years, when the X-ray pictures showed an oblique fracture of ·a bone, as in this case, was to treat it by the "open wound" method of bone surgery. This was not done. All of this indicates that defendant did not use ordinary care and diligence in diagnosing the fracture nor in examining the broken leg, nor in using the proper method of treatment after he was taken ·to the hospital, where he had been taken at defendant's request in order that he might have better care and treatment. The evidence also discloses that there was a poor result. The X-ray plates showed that the broken ends of the bone were not in apposition but overlapped more than an inch, and indicated that the jagged ends came in contact with the flesh, and were not in alignment by as much as ten or twelve degrees. The evidence also showed that the leg was practically useless and had been since the accident to the time of trial in June, 1922. Other

items of evidence favorable to plaintiff might be pointed out but these are sufficient to require the submission of the case to the jury. Some inferences favorable to defendant might be drawn from the evidence but these could not be considered by the court on a demurrer to the evidence. See, also, *Wingfield v. McClintock,* 85 Kan. 207, 113 Pac. 394; and *Rainey v. Smith,* 109 Kan. 692, 201 Pac. 1106.

.Passing the demurrer, there is not much favorable to the defendant in the evidence. On the witness stand defendant did not controvert the evidence of plaintiff's medical witnesses as to the proper method of treating the broken leg; neither did he contend that he exercised his best judgment in pursuing one of two or more approved courses of treatment. These questions are practically out of the case. His testimony was to the effect that he wanted to take an X-ray picture and talked to the plaintiff about it on two or more occasions and urged that it be done. On this controverted question the jury made a special finding to the effect that plaintiff had asked defendant to take an X-ray picture of his leg and that defendant refused. This special finding and the general verdict for plaintiff approved by the court settled that controversy. The evidence offered by defendant brought out more clearly that the X-ray was needed as a part of the diagnosis; that if used it would have shown the condition of the fractured bone and that there was a well equipped X-ray machine at the hospital within twenty feet of plaintiff's ward.

Appellant contends that the court erred in permitting Doctor Gier, in answer to a hypothetical question, to give it as his judgment that it was negligence not to use the X-ray, and cites *Insley v. Shire,* 54 Kan. 793, 39 Pac. 713, where the court held it error to admit in evidence the opinion of a witness as to whether or not a person had exercised due diligence, but that holding was because that case was not one in which the evidence could be established by expert witnesses (p. 804). In this case the negligence of the treatment must be shown by expert witnesses. (See *Hoskinson v. Smyser,* 95 Kan. 568, 148 Pac. 640.)

Appellant complains that the court refused to give instructions requested, the first of which requested a peremptory instruction for defendant. Since, as we have seen, there was evidence to go to the jury, the court could not give that instruction. "If the demurrer to plaintiff's evidence could not be sustained, a verdict against her

James v. Grigsby.

could not be directed." (*Stout v. Bowers*, 97 Kan. 33, 36, 154 Pac. 259.) The next was to the effect that the defendant was not obligated to take an X-ray picture of plaintiff's leg unless plaintiff requested the same and tendered the cost thereof. This was properly refused. The evidence is that it was the proper treatment to take the X-ray picture if facilities were available. Hence it was the duty of the defendant to take it without request and under the evidence of both plaintiff and defendant the question of pay did not enter into it. It may be doubted whether plaintiff would be required to pay in advance for the use of an X-ray any more than he would for the use of any surgical instruments or appliances or for bandages, but that need not here be decided. The other instructions requested were either given in substance or were not applicable to the testimony in the case.

Appellant complains of instructions given, especially instruction No. 12, which reads as follows:

"You are instructed that human health and life is a valuable and important thing, not to be slighted and neglected by a doctor when he once assumes its care and treatment, and no doctor in that relation has the right to be neglectful of his patients. In other words, it is the bounden duty of a physician and surgeon, when treating and caring for a sick or injured patient, to bring to bear upon the case all his learning, skill and best judgment and use in and about such treatment the caution, care and skill usually employed in like cases by learned and skilled doctors in the community in which he practices his profession."

This instruction is open to the objection that it requires the physician to bring to bear upon the case "all his learning, skill and best judgment," for no one, whether he be physician, lawyer, mechanic, or athlete, can always be at his best, but the latter part of the same sentence requires only that the physician use in his treatment the caution, care and skill usually employed in like cases, and this is the correct rule. As we have heretofore pointed out, the defendant in this case did not contend that he had used all his skill and learning or that he had even used what was shown, without controversy, to be the proper and ordinary treatment. Had the defendant shown, or attempted to show, that the treatment he used was the ordinary and proper treatment, and then the court had, by its instructions, required him to bring to the case a higher degree of learning and skill, there would be more merit in his objection. Though the instruction is not approved, as tending to place upon the defendant a higher degree of the use of his learning and skill than the law re-

quires, it is not regarded, under the facts in this case, as being sufficiently erroneous to require a reversal. This instruction is also objected to because of the first sentence in it, but this is a correct statement of the law. 3 Blackstone's Commentaries, p. 122, says:

"Injuries affecting a man's health are, where by any unwholesome practices of another a man sustains any apparent damages in his vigor or constitution, as, by . . . the neglect or unskilled management of his physician, surgeon or apothecary. For it hath been solemnly resolved that *male praxis* is a grave misdemeanor and offense at common law, whether it be for curiosity and experiment or by neglect; because it breaks the trust which a party has placed in his physician and tends to the patient's destruction."

Other instructions are criticised but need not be especially noted.

Finding no material error in the case the judgment of the court below is affirmed.