No. 59,781

GERALD WOZNIAK, *et al., Appellees,* v. JAY I. LIPOFF, M.D.,
*Appellant.*
(750 P.2d 971)

Opinion filed February 19, 1988.

*Thomas M. Sutherland,* of Holbrook, Ellis & Heaven, P.A., of Kansas City, argued the cause, and *Paul C. Gurney* and *Reid F. Holbrook,* of the same firm, were with him on the brief for appellant.

*John L. White,* of Leavenworth, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is a medical malpractice action filed by the survivors of Patricia Wozniak against Dr. Jay Lipoff for negligence in the treatment of Wozniak's Graves' disease. The jury returned a verdict finding Wozniak to be 20% at fault and Dr. Lipoff to be 80% at fault. Judgment was therefore entered against Dr. Lipoff for $584,000, 80% of the total damages of $730,000 found by the jury. Dr. Lipoff appeals.

Patricia Wozniak had worked for Dr. Lipoff as his medical secretary since June of 1982. In July of 1984, Dr. Lipoff ran tests on Wozniak after noticing her eyes had begun to bulge and her thyroid gland was enlarged. The tests showed Wozniak to be hyperthyroid, and Dr. Lipoff, diagnosing her case as Graves' disease, agreed to treat Wozniak at her request.

Graves' disease is a disease of the thyroid gland whereby the gland secretes excessive thyroid hormone. The hormone affects many bodily functions. When an excess is produced, the body's basic metabolism speeds up, or as one expert expressed it, the engine races. The heart rate accelerates, the brain functions too rapidly, appetite increases, and inappropriate sweating occurs. Such hyperthyroidism is dangerous and may result in the inability to concentrate, confusion, insomnia, heart palpitations leading to a heart attack, and other serious problems. The patient becomes anxious and irritable, and engages in inappropriate behavior and may develop serious psychiatric problems. Objective physical signs may include severe weight loss, significant enlargement of the thyroid gland, and bulging eyeballs. Because of its diverse effects on the patient, Graves' disease is considered a "whole body" disease.

One of the ways in which Graves' disease can be controlled is through drug therapy. The therapy usually takes about two years, and has about a 40-50% success rate. If the therapy is not eventually successful, the gland must be partially removed by surgery or radioactive iodine. Dr. Lipoff testified Wozniak chose to begin with drug therapy, and he accordingly prescribed a 300 mg. daily dosage of Propylthiouracil (PTU), a drug commonly used in the treatment of Graves' disease to inhibit the hormone excretions.

Accepted PTU treatment consists of starting the patient on a relatively high dosage with gradual reduction to a lower maintenance dosage after the thyroid is functioning normally. This treatment is continued for eighteen months to two years to prevent relapse. If the remission is not permanent, the disease must be treated anew. The treatment period is so prolonged because it takes considerable time to determine what effect a particular dosage has on the production of thyroid hormone.

On September 5, 1984, Dr. Lipoff increased Wozniak's dosage to 600 mg. after tests showed she was, although improving, still hyperthyroid. October and November tests showed Wozniak to be functioning in the upper limits of the normal range for thyroid function.

Shortly after Thanksgiving, however, Wozniak evidenced severe anxiety at the office. She kept handing her keys to Dr. Lipoff, informing him he had fired her. Five minutes after being informed she had not been fired, she would again return the keys, saying she was sorry he had fired her. She would cry without provocation and seemed to think people were watching her suspiciously. Dr. Lipoff, although finding her behavior increasingly inappropriate and noting she showed "thought disorder and paranoid ideation," did not talk to her or her family about the deep depression sometimes associated with Graves' disease.

Wozniak's mental condition had become so unbalanced by December that Dr. Lipoff diagnosed her as suffering from paranoid schizophrenia and arranged for her husband to hospitalize her while Dr. Lipoff was out of town. After arranging for a consultation with a psychologist, Dr. Frederick Tirrell, Dr. Lipoff changed his diagnosis of Wozniak's mental condition to depression.

It is claimed Wozniak's depression was a mental illness which was unrelated to Graves' disease. But there was no evidence Wozniak had ever suffered any form of mental illness prior to developing Graves' disease. Dr. Burglass found absolutely no prior history of depression. He testified it would be very unlikely for the depression to be unrelated to Graves' disease.

December thyroid tests showed Wozniak's thyroid function to have dropped to the low normal range. Concerned she might

become *hypo*thyroid, Dr. Lipoff reduced Wozniak's PTU dosage to 300 mg. upon admission to the hospital. He also prescribed an antipsychotic drug, Haldol, and a 75 mg. daily dosage of the antidepressant drug Sinequan.

Wozniak was clearly depressed during the first days of her stay in the hospital and was so characterized by hospital staff. She continued to cry and it was reported she spoke of suicide. By December 20, however, Dr. Lipoff saw clear signs of improvement.

Wozniak continued to display the obvious and classic signs of Graves' disease. Her eyeballs bulged, she was "jittery and flighty," and the large goiter on her neck had not decreased in size. Further thyroid function testing caused Dr. Lipoff to believe, however, that Wozniak was borderline hypothyroid and he stopped PTU treatment altogether on December 21.

Although Wozniak was reported to be still having crying spells on December 22, Dr. Lipoff felt her depression was greatly improved. He released her from the hospital, but *increased* her dosage of Sinequan to 100 mg.

He gave her a prescription of 60 pills with three refills. The manufacturer of Sinequan published the following warning concerning the drug:

"Since suicide is an inherent risk in any depressed patient and may remain so until significant improvement has occurred, patients must be closely supervised during the early course of therapy. Prescriptions should be written for the smallest feasible amount."

Wozniak did not return to work over the Christmas season. On December 24, Dr. Lipoff put Wozniak back on PTU at 50 mg. a day, but he again stopped the drug completely on December 26.

Wozniak was to have seen Dr. Tirrell, the psychologist, on December 26, but cancelled the appointment. He insisted she see him on the 27th and during that appointment learned she was unhappy with Dr. Lipoff both as her employer and her physician.

Wozniak had an appointment with Dr. Lipoff on December 31, which he had to cancel because of a snowstorm. He was unable to reach Wozniak to tell her. Accordingly, she was angry when she showed up and he was not there. He called her at home that evening and tried to make a new appointment, but she refused.

On January 3, 1985, Dr. Tirrell saw both Wozniak and her husband and suggested she see Dr. Milgram, a psychiatrist. Dr. Milgram insisted Wozniak first see an endocrinologist, and an appointment with Dr. David Sneid was set for January 7, 1985.

On January 4, Wozniak and her son went to Dr. Lipoff's office to get her records for the appointment with Dr. Sneid. Wozniak's son testified Dr. Lipoff was rude to them and questioned Wozniak's decision to see an endocrinologist. He informed them the records would not be available until later because they had to be photocopied.

At the January 7 appointment with Dr. Sneid, Wozniak seemed calm and asked appropriate questions. She killed herself the next day with an overdose of approximately 55 pills of Sinequan.

The first issue to be considered is whether the trial court erred in denying Dr. Lipoff's motion for a directed verdict. The trial court was required to submit the case to the jury if the evidence and all inferences reasonably drawn therefrom, viewed in the light most favorable to the party against whom the ruling was sought, were such that reasonable minds could differ on the conclusion to be drawn. In reviewing the trial court's denial of the motion, our scope of review is the same; if the evidence or the inferences which may be drawn therefrom could, when viewed in the light most favorable to the party opposing the motion, reasonably support different conclusions, the decision is properly one for the jury. *Sampson v. Hunt*, 233 Kan. 572, 578, 665 P.2d 743 (1983).

Three elements must be proven through expert testimony in order for a plaintiff to prevail in a medical malpractice case: (1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injuries sustained by the patient. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983).

In order to resolve appellant's first issue of error, let us examine each of plaintiffs' allegations of negligence and the evidence introduced in support of them. These claims will be referred to later in the discussion of other issues.

First: Plaintiffs claim the defendant failed to refer Patricia Wozniak to an appropriate consulting physician despite his lack of experience and his difficulty in managing this particular case.

Dr. Lipoff is an internist rather than an endocrinologist, and had limited training and experience in treating Graves' disease.

Defendant's own expert, Dr. Leslie DeGroot, when asked when referrals were proper, stated, "The rules are that whenever the diagnosis is in doubt or when there's a complication, that one should get referral." Dr. DeGroot and Dr. Joseph Kyner, an endocrinologist testifying for defendant, further testified that the two critical factors in determining when a referral is needed are the condition of the patient and the experience of the treating physician.

Wozniak's condition was obviously unstable; tests showed a decrease in thyroid function, but the symptoms of Graves' disease remained. Her depression was so severe she required hospitalization. The experts agreed psychiatric problems are one of the complications possible with Graves' disease.

Dr. Lawrence Gavin, plaintiffs' expert, testified it would have been appropriate under the circumstances for Dr. Lipoff to have called in an endocrinologist.

We conclude there was sufficient evidence of Dr. Lipoff's negligence to submit the issue to the jury.

Second: Plaintiffs claim the defendant failed to formulate and communicate a definitive treatment plan for the decedent's condition despite the requirement of the development of such a plan and medical knowledge that the communication of the plan to the patient on an understandable basis would be a critical element in the successful treatment of this condition.

Dr. Milton Burglass, a psychiatrist who qualified as an expert on the relationship between depression and Graves' disease, testified reassurance from the treating physician that the condition would get better was very important to a patient with Graves' disease. Both Dr. Gavin and Dr. DeGroot testified it was extremely important, in the treatment of Graves' disease, that the "whole person" be treated because of the emotional problems caused by it. Dr. Gavin, Dr. Kyner, and Dr. Sneid all testified it was important that the disease, with its complications, treatments, and side effects, be carefully explained to the patient.

Dr. Lipoff testified he had discussed with Wozniak the different methods which could be used to treat the disease, and

Mary Montgomery, another employee of Dr. Lipoff's, testified she saw Wozniak reading a pamphlet about the disease. Both Dr. Sneid and Dr. Gavin, however, reported that a review of Wozniak's medical records showed no notation that such an explanation of the disease had been given her. Dr. Gavin testified the lack of explanation to Wozniak about the possible consequences of her disease was a deviation from acceptable medical care.

Dr. DeGroot testified that by December, when Wozniak's mental problems were increasingly apparent, Dr. Lipoff also had the duty to discuss the problems of Graves' disease with Wozniak's husband.

Though contradicted, we find sufficient evidence to submit this issue to the jury.

Third: Plaintiffs claim the defendant failed to give sufficient weight and consideration to the opinion of the consultant obtained by defendant in the treatment of the deceased.

The only person Dr. Lipoff consulted was a psychologist, Dr. Tirrell, soon after Wozniak was admitted to the hospital. Dr. Tirrell recommended aggressive treatment of Wozniak's Graves' disease. Instead, Dr. Lipoff discontinued the medication designed to treat Graves' disease. Dr. Gavin testified discontinuation of PTU therapy would certainly not constitute "aggressive treatment" of the disease. This constitutes sufficient evidence to submit the issue to the jury.

Fourth: Plaintiffs contend the defendant failed to communicate necessary information regarding the treatment of Patricia Wozniak to the consultant although the defendant knew the consultant would continue to treat her.

Dr. Tirrell testified he thought he would have "insisted we get going with something," had he known Dr. Lipoff had discontinued PTU treatment. But Dr. Lipoff did not give his consultant this information. Dr. Kyner testified a consultant should be informed of changes in the treatment of Graves' disease.

Dr. Lipoff admitted Dr. Tirrell had the right to be informed of changes in medication. Because Graves' disease is a "whole body" disease, it is important that the expert treating psychological problems and the expert treating physical problems be aware of each other's actions. We find sufficient evidence for consideration by the jury.

Fifth: Plaintiffs allege the defendant negligently entered into treatment of a person who was his employee for a disease that had psychological, psychiatric, and emotional components, and which placed the doctor and patient into a conflicting relationship with that of employer and employee, and this conflict eventually proved to be a factor in the death of Patricia Wozniak.

Dr. DeGroot, Dr. Kyner, and Dr. Sneid all testified it was important for a Graves' disease patient to be in a restful and non-stressful environment. Dr. DeGroot said it was possible the employer-employee relationship between Dr. Lipoff and Wozniak could have instead exacerbated stress on Wozniak. There was also testimony Wozniak's job responsibilities increased while she was being treated, as she was in part responsible for training three new staff members between September and December.

This allegation of negligence was therefore properly presented to the jury.

Sixth: Plaintiffs' next allegation is the defendant negligently failed to properly advise Patricia Wozniak or her family concerning the symptoms of Graves' disease, the treatment modalities accepted for the condition, and the existence or nonexistence of side effects from the program of therapy.

The resolution of this issue was clearly dependent on which evidence was believed. Dr. Lipoff testified he discussed with Wozniak the different methods of treatment of Graves' disease, and Mary Montgomery testified she noticed Wozniak reading a pamphlet on the disease. But both Dr. Sneid and Dr. Gavin testified the medical records showed no indication Dr. Lipoff had advised Wozniak or her family about the disease.

Dr. Kyner testified Dr. Lipoff had the duty, because of the manufacturer's warning, to warn both Wozniak and her family about the dangers of Sinequan. There was evidence Dr. Lipoff did not do so. The issue is clearly one for the jury.

Seventh: Plaintiffs next claim the defendant negligently prescribed a quantity of a psychotropic drug, sold under the brand name of Sinequan, in contradiction to and violation of the advice and caution of the manufacturers of this drug, which directly caused the death of Patricia Wozniak.

Dr. Burglass testified it would be extremely unlikely that

Wozniak's depression would have been cured within the short time she was on Sinequan in the hospital. He testified she was certainly still depressed when released. Dr. Lipoff's own notes indicated his belief "[i]t is important to note that Sinequan will take at least seven to ten days to produce the desired effect." Yet he increased the dosage after only seven days and released Wozniak with a prescription for 60 pills with three refills.

Dr. Kyner testified Wozniak's dosage was not "the smallest feasible amount" required by the manufacturer's warning. Dr. Burglass testified a physician must be "very careful" in the use of Sinequan with a Graves' disease patient, and should see such a patient "every two days" to monitor his or her progress. This does not mean that Dr. Burglass testified a two-day supply was the smallest feasible amount which might be prescribed *if* he was going to see a patient every two days.

Dr. Burglass stated, "There is an indication that tricyclic antidepressants are prone to have an exaggerated cardiac toxicity in hyperthyroid patients, so one has to be very, very cautious about its use . . . . Doesn't mean that one couldn't use it, but one would have to be very, very cautious about its use and monitor the person extremely, extremely closely."

The evidence on this claim of negligence presented a jury question.

Eighth: The plaintiffs allege the demeanor and attitude of the defendant as expressed through his acts and statements made toward the decedent were in direct contradiction to and violation of all standards relating to the care of the endocrine condition of Graves' disease and directly contributed to the death of Patricia Wozniak.

The testimony was unanimous that Graves' disease is a complicated and dangerous disease in which it is essential that the whole person be treated because depression is one of its complications. Dr. Burglass testified depression is the major cause of suicide. There was testimony a Graves' disease patient may typically feel she is rapidly deteriorating and will never get better. The treating physician's reassurance and availability, it was stated, are needed to maintain patient stability. There was also testimony that a non-stressful environment is helpful to the treatment of the disease. Yet, there was testimony Dr. Lipoff did

not discuss the ramifications of the disease with Wozniak and, instead, increased her work load.

Despite medical knowledge that severe depression is a complication of Graves' disease, Dr. Lipoff labeled her a paranoid schizophrenic and had her husband hospitalize her while Dr. Lipoff was out of town.

When Wozniak's depression continued in the hospital, there was testimony Dr. Lipoff became impatient with her and told her she was being "too difficult." She was still having crying spells on the day he released her from the hospital, but he testified he believed she was without depression.

Wozniak's son testified Dr. Lipoff was rude to Wozniak when she came to pick up her medical records and questioned her decision to consult an endocrinologist.

Given the foregoing evidence, a fact question for the jury was presented.

Ninth: Plaintiffs also allege the defendant ignored numerous and obvious symptoms and signs that the decedent continued to suffer from Graves' disease and discontinued treatment.

Dr. Lipoff relied on tests and found Wozniak to be euthyroid despite her continued enlarged thyroid, bulging eyeballs, and nervousness—all classic symptoms of Graves' disease. Dr. Gavin testified the enlarged goiter should have been a "warning feature," because patients who are actually in remission "tend to get a marked shrinkage of the gland."

Dr. Gavin testified he "would not consider the overall care of Mrs. Wozniak's Graves' disease to be consistent with standard medical practice." He testified Dr. Lipoff failed to provide Wozniak with an acceptable level of care when he failed to maintain her on PTU for a longer period of time and failed to decrease the dosage gradually. When asked about Dr. Lipoff's termination of PTU treatment, Dr. Gavin called it "totally inappropriate." He testified medical knowledge showed Wozniak was "at a very high risk of relapse," and that "knowing this information in the setting of somebody with an acute psychiatric disturbance" made the cessation of treatment especially inappropriate.

We find sufficient evidence for this claim to go to the jury.

We hold there was competent evidence introduced in support

of each allegation of negligence, which included the three essential elements required in a medical malpractice case. Thus, the trial court did not err in overruling the motion for a directed verdict.

Dr. Lipoff next argues that because the jury returned a general verdict the verdict cannot be sustained by this court unless sufficient evidence is found to support all the specific negligence claims. He claims the evidence was insufficient to support the general verdict. However, our having found sufficient evidence to support the submission of each claim to the jury refutes this argument. A general verdict will stand if any of the allegations of negligence is supported by competent evidence in the absence of erroneous instructions. The cases upon which Dr. Lipoff relies involve erroneous instructions.

Dr. Lipoff argues the trial court erred in instructing the jury on allegations of negligence which were not included in the pretrial order. The alleged errors are contained in Instructions No. 3 and No. 12, to which Dr. Lipoff made contemporaneous objections. Instruction No. 3 provides:

"The family of Patricia Wozniak, deceased, brings this action. The survivors and heirs of Patricia Wozniak are Gerald Wozniak, Richard Craig Conti, Christina Wozniak, and Christopher Wozniak.

"The claim being made by the family against the defendant is that he negligently treated Patricia Wozniak for an extreme hyperthyroid condition called Graves' Disease. The specific complaints under this allegation of negligence are as follows:

"1. The defendant failed to refer Patricia Wozniak to an appropriate consulting physician despite his difficulty in managing this particular case, and despite his lack of experience with Graves' Disease.

"2. The defendant failed to formulate and communicate a definitive treatment plan for the decedent's condition despite the requirement of the development of such a plan and communicating it to the patient on an understandable basis would be a critical element in the successful treatment of this condition.

"3. The defendant failed to give sufficient weight and consideration to the opinion of the consultant obtained by him in the treatment of the decedent.

"4. The defendant failed to communicate necessary information regarding the treatment of Patricia Wozniak to the consultant although the defendant knew that the consultant would continue to treat Patricia Wozniak.

"5. The defendant negligently entered into treatment of a person who was his employee for a disease that had psychological, psychiatric, and emotional components, and which placed the doctor and patient into a conflicting relationship with that of employer and employee, and this conflict eventually proved to a be a factor in the death of Patricia Wozniak.

"6. The defendant negligently failed to properly advise Patricia Wozniak or her family concerning the symptoms of the disease of Graves' Disease, the treatment modalities accepted for the condition, and of the existence or non-existence of side effects from the program of therapy.

"7. The defendant negligently prescribed a quantity of a psychotropic drug, sold under the brand name of Sinequan, in contradiction and violation of the advice and caution of the manufacturers of this drug, which directly caused the death of Patricia Wozniak.

"8. The demeanor and attitude of the defendant as expressed through his acts and statements made toward the decedent were in direct contradiction and violation of all standards relating to the care of the endocrine condition of Graves' Disease, and directly contributed to the death of Patricia Wozniak.

"9. The defendant ignored numerous and obvious symptoms and signs that the decedent continued to suffer from her condition of Graves' Disease, and discontinued treatment for that condition.

"The family of Patricia Wozniak has the burden of proving that the above claims, or any of them, are more probably true than not true.

"The defendant denied that he was at fault in any of the above-named particulars claimed by the family, and further denies the family has sustained losses to the extent claimed."

Plaintiffs' Itemization of Negligence in the pretrial order states:

"Plaintiffs respectfully state that the defendants have taken lengthy depositions of each of the experts designated by plaintiffs. In addition, the defendants have been provided with a lengthy report of Dr. Lawrence Gavin which was provided to them in November of 1985. Moreover, plaintiffs have a videotape and transcript of Dr. Gavin's trial testimony which they have shown to the only expert that the plaintiff has been able to depose designated by the defendant, Dr. Kyner, and the specifications of negligence in this complex medical malpractice case are included in the material suggested above. The plaintiff specifically incorporates all of the specifications of negligence designated in the reports, depositions, and trial testimony of the experts designated by the plaintiffs and who have been made available for depositions to the defendants in accordance with the Court's original discovery conference Order.

"The general specifications of negligence contended by plaintiffs, with the understanding that all of the specifics described in the lengthy depositions and reports above are also included in this portion of the response to the Pretrial Order are as follows:

"1. The defendant negligently and improperly treated Patricia Wozniak for a hyperthyroid condition called Graves' Disease. The specifics of the improper treatment are included in the experts' depositions and reports.

"2. The defendant failed to refer Patricia Wozniak to an appropriate consulting expert for her condition to arrive at a definitive treatment plan.

"3. The defendant halted treatment of Patricia Wozniak's Graves' Disease and this cessation of treatment caused her death.

"4. The defendant placed Patricia Wozniak in Cushing Memorial Hospital in December of 1984 for a condition that was misdiagnosed.

"5. The defendant failed to properly respect the opinions of the consultation that he did obtain for Patricia Wozniak.

"6. The defendant negligently entered into a treatment program with a person who was his employee for a disease that has numerous emotional components, placing the doctor and patient into a conflicting relationship with that of employer/employee and this eventually caused the death of Patricia Wozniak.

"7. The defendant negligently prescribed a high dose of a psychotropic doxepin drug against the advice and cautions of the manufacturer of this drug, sold under the brand name of Sinequan, which directly caused the death of Patricia Wozniak.

"8. The defendant failed to properly advise Patricia Wozniak concerning the symptoms of the disease of Graves' Disease, the treatment modalities for this disease, and side effects from the program of treatment therapy.

"9. The defendant abandoned his patient, Patricia Wozniak, which directly caused her death.

"[10]. The plaintiffs also specifically incorporate all references to negligence made in the depositions and reports of the plaintiffs' experts, which have already been provided to the defendant in compliance with the original Pretrial Discovery Conference Order."

The issue is whether the instructions on negligence to the jury are at sufficient variance from the allegations of negligence in the pretrial order to be outside the issues in the case and thus constitute surprise with prejudice to Dr. Lipoff.

Let us compare the instructions with the corresponding portions of the pretrial order. For purposes of clarity, it will be necessary to repeat the pertinent sections of the instructions and the pretrial order.

As a preliminary matter, it should be noted plaintiffs made two general statements in the pretrial order which apply to all instructions. The introductory paragraph states:

"The plaintiffs specifically incorporate all of the specifications of negligence designated in the reports, depositions, and trial testimony of the experts designated by plaintiffs and who have been made available for depositions to the defendants in accordance with the Court's original discovery conference Order."

Subsection 10 of the pretrial order states:

"The plaintiffs also specifically incorporate all references to negligence made in the depositions and reports of the plaintiffs' experts, which have already been provided to the defendant in compliance with the original Pretrial Discovery Conference Order."

Now we compare the specific instructions and the pretrial order, keeping in mind the content of the foregoing general provisions.

Subsection 2 of Instruction No. 3 states:

"The defendant failed to formulate and communicate a definitive treatment plan for the decedent's condition despite the requirement of the development of such a plan and communicating it to the patient on an understandable basis would be a critical element in the successful treatment of this condition."

Subsection 8 of the pretrial order states:

"The defendant failed to properly apprise Patricia Wozniak concerning the symptoms of the disease of Graves' Disease, the treatment modalities for this disease, and side effects from the program of treatment therapy."

We stated in *Baugher v. Hartford Ins. Co.*, 214 Kan. 891, 899, 522 P.2d 401 (1974), that the purpose of a pretrial order, as provided by K.S.A. 60-216, is to "acquaint each party in advance of trial with respect to the factual contentions of the parties upon matters in dispute, thus reducing the opportunity for maneuver and surprise at trial."

When we view subsection 2 of Instruction No. 3 in conjunction with the general statements in the pretrial order, we conclude Dr. Lipoff was adequately apprised of the theory upon which the plaintiffs relied on this issue.

There is no evidence the trial court abused its "large discretionary powers" in modifying the plaintiffs' allegation of negligence to the language of the allegations to be considered by the jury in subsection 2. See *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 442, 581 P.2d 372 (1978).

Subsection 4 of Instruction No. 3 states:

"The defendant failed to communicate necessary information regarding the treatment of Patricia Wozniak to the consultant although the defendant knew that the consultant would continue to treat Patricia Wozniak."

Subsection 5 of the pretrial order states:

"The defendant failed to properly respect the opinions of the consultation that he did obtain for Patricia Wozniak."

There was ample evidence introduced at trial concerning Dr. Lipoff's failure to inform Dr. Tirrell of medication changes. There is no evidence the testimony created surprise for Dr. Lipoff or that he was not presented an opportunity to defend

himself against the claim. Again, when we consider the evidence and the entire pretrial order, we conclude there was sufficient information on file to inform the defendant of the nature of plaintiffs' claim. The trial court was thus justified in giving this instruction.

Subsection 6 of Instruction No. 3 states:

"The defendant negligently failed to properly advise Patricia Wozniak or her family concerning the symptoms of the disease of Graves' disease, the treatment modalities accepted for the condition, and of the existence or non-existence of side effects from the program of therapy."

Subsection 8 of the pretrial order states:

"The defendant failed to properly apprise Patricia Wozniak concerning the symptoms of the disease of Graves' Disease, the treatment modalities for this disease, and side effects from the program of treatment therapy."

As we can see, the pretrial order omitted the claim that Dr. Lipoff failed to advise the Wozniak *family.* Dr. Lipoff's expert witness, Dr. DeGroot, was not produced for deposition prior to the time the plaintiffs were required to respond to the pretrial order. When, at trial, he testified that the *family* should also be advised, the court properly added this to the allegations in the instructions. Since this evidence was provided by Dr. Lipoff's expert witness, he cannot claim surprise.

Subsection 8 of Instruction No. 3 states:

"The demeanor and attitude of the defendant as expressed through his acts and statements made toward the decedent were in direct contradiction and violation of all standards relating to the care of the endocrine condition of Graves' disease, and directly contributed to the death of Patricia Wozniak."

There is no corresponding specific allegation in the pretrial order covering these acts of negligence. However, we find this allegation is supported by testimony at trial which was properly reserved by the plaintiffs in the general provisions of the pretrial order. There is no evidence of prejudice or surprise on the part of Dr. Lipoff which would justify a finding the trial court abused its discretion in including the allegation.

Dr. Lipoff also objects that the trial court included an instruction on informed consent despite the failure of the plaintiffs to specifically allege lack of informed consent. The trial court's Instruction No. 12 provides:

"A physician has a duty to make a reasonable disclosure to his patient of the

nature and probable consequences of the suggested or recommended treatment including the dangers within his knowledge which are possible in the treatment he proposes. This disclosure is required in order that the patient will have a basis to make an intelligent informed consent to the proposed treatment. The duty of the physician to disclose is limited to those disclosures which a physician would reasonably make under the same or similar circumstances.

"If a complete disclosure of all facts, diagnosis and possible consequences would endanger the recovery of the patient because of his existing physical or mental condition, the physician may withhold such information."

In subsection 8 of the pretrial order, the plaintiffs alleged Dr. Lipoff failed to properly advise Patricia Wozniak about the disease, treatment, and side effects. Failure to disclose was not equated with informed consent in the pretrial order.

This instruction states the law as applied to the facts of the case. Evidence was introduced that Dr. Lipoff failed in his duty to disclose to Wozniak the nature and dangers of her treatment for Graves' disease. That the instruction went on to give the *reason* such a duty is imposed on a physician—so that informed consent may be obtained—is immaterial in determining the *fact* of nondisclosure. The giving of Instruction No. 12 did not mislead the jury and thus is not a ground for reversal. *Timsah v. General Motors Corp.*, 225 Kan. 305, 591 P.2d 154 (1979).

Dr. Lipoff next argues the trial court overemphasized the matter of informed consent by giving Instruction No. 12 in addition to Subsections 2 and 6 of Instruction No. 3. *Timsah* states a trial court should not overemphasize one theory of the case.

Only Instruction No. 12 concerns informed *consent*, however. Subsection 2 of Instruction No. 3 is based on testimony that it is important for a Graves' disease patient to be assured that the disease is curable and is being systematically treated; subsection 6 of that instruction is based on information presented at trial that it is important for a Graves' disease patient and his or her family to be informed that depression is sometimes a symptom of Graves' disease and for them to understand the implications of that.

We find no overemphasis of informed consent. The matter of nondisclosure was mentioned in three instructions but in a different context each time. There is no showing that these instructions taken together prejudiced Dr. Lipoff. When there is

sufficient evidence supporting each theory of negligence and no prejudicial error in instructions, special findings by the jury are not required and a general verdict will be upheld. See *Taylor v. State Highway Commission*, 182 Kan. 397, 401, 320 P.2d 832 (1958); *cf. Franklin v. Northwest Drilling Co., Inc.*, 215 Kan. 304, 314-15, 524 P.2d 1194 (1974).

Dr. Lipoff's final claim of error is that Wozniak's suicide resulted from her intervening acts rather than his negligence.

He cites Wozniak's refusal to see him after he missed an appointment with her and evidence which showed she did not take the Sinequan on a daily basis as prescribed. There was evidence she may have taken only five Sinequan pills in the 17-day period before her suicide.

Whether an intervening cause exists is a question ordinarily to be decided by the jury. See *Secrist v. Turley*, 196 Kan. 572, 579, 412 P.2d 976 (1966). Dr. Lipoff testified he agreed with the manufacturer's warning for Sinequan that suicide must always be considered a possibility when treating a depressed patient. The warning clearly stated the patient taking Sinequan should be prescribed in the lowest feasible amount. There was no question that 60 tablets of 100 mg. of Sinequan with three refills was not the lowest feasible amount which could have been prescribed. Thus, there was competent evidence from which a rational factfinder could find Dr. Lipoff should have reasonably foreseen the danger of Patricia Wozniak committing suicide by an overdose of Sinequan.

Dr. Lipoff did not raise the issue of whether it was error for the trial court to fail to instruct on intervening acts, and this court does not have the power to raise that issue for him. In fact, Dr. Lipoff could not have raised such an issue, for he failed to request an instruction on intervening acts at trial. See K.S.A. 60-251(b); *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984).

Objections to the lack of expert medical testimony that Dr. Lipoff's negligence *caused* Wozniak's suicide was an issue properly decided by the jury. It was the province of the expert medical witnesses to testify as to the proper medical treatment for Graves' disease. There was expert medical testimony that Dr. Lipoff was negligent in that treatment. "[W]here negligence in

the treatment is shown by medical witnesses and the evidence shows a bad result, it is the province of the jury to say whether the result was caused by the negligence." *James v. Grigsby*, 114 Kan. 627, 632, 220 Pac. 267 (1923).

In *Grigsby*, there was medical testimony that the defendant physician deviated from accepted medical practice by not using an X-ray to examine the plaintiff's broken leg. The experts were unable to testify, however, that this negligence was the cause of the plaintiff's leg not mending straight, because sometimes this happens even after proper medical treatment. So it is with the case at bar; expert medical witnesses testified to negligence, but not to causation. It is evident a depressed patient might commit suicide despite the best of care. It is a firmly established rule that a jury's verdict may not be disturbed by an appellate court if there is substantial competent evidence in the record to support it. *Diefenbach v. State Highway Commission*, 195 Kan. 445, 447, 407 P.2d 228 (1965). We do not have the power to look at the evidence supporting the appellant's theories, or to weigh the evidence, or to decide what our verdict would have been had we been the jury. We are not the jury, and we may only examine the evidence in support of the jury's verdict. *Kliebrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 440-41, 581 P.2d 372 (1978).

The evidence substantially and competently supports the verdict. The judgment of the trial court is affirmed.

McFARLAND, J., dissenting: I believe the district court erred in failing to grant Dr. Lipoff's motion for a directed verdict. By virtue of the nature of the issues raised, a detailed statement of the evidentiary facts is necessary. I believe the recitation of facts contained in the majority opinion is too highly summarized and conclusional. Therefore, although there are areas of repetition with the majority opinion, a more detailed recitation of the facts is included herein as follows.

Graves' disease is considered to be a controllable condition. There are three options for treatment:

1. surgical removal of a substantial part of the thyroid gland;
2. ingestion of radioactive iodine which collects in the gland and burns part of the gland away; and

3. drug therapy by means of a thyroid inhibiting drug such as Propylthiouracil (PTU).

Each of the alternative treatments has pluses and minuses associated with it. Surgical treatment with optimum results can lead to a permanent solution to the problem. As with any surgery there are risks associated with the administration of anesthesia, and post-surgical complications. If too much of the gland is removed, the patient may become hypothyroid requiring life-time thyroid supplemental medication. If too little of the gland is removed, the patient may remain hyperthyroid. Obviously, surgical removal of a part of the gland results in a permanent alteration of a portion of the body.

Treatment with radioactive iodine does not involve the surgical risks and the optimum result can be a permanent cure. However, if too much or too little of the gland is burned away, the same permanent problems are present as with too much or too little of the gland being surgically removed. Also, as with the surgical alternative, a permanent alteration of the body has occurred.

Drug treatment has the advantage that no permanent alteration of the body occurs. The patient is not exposed to the risks of surgery or the ingestion of a radioactive substance into the body. If drug therapy does not work, the other two options are still available. Cure is effected only 40 to 50 percent of the time. Drug therapy usually takes two years. The patient starts out with a relatively high dosage of the drug. When normal thyroid function is restored the dosage is reduced, then further reduced if the patient's thyroid function stays in the normal range, then further reduced and so on until the final very low dosage is stopped. Hopefully, the period of remission will become permanent and no further treatment will be needed. Much of the time, however, the thyroid function will gradually increase until the patient must again be treated with the three options again presented. Not infrequently, a patient who has been unsuccessful in achieving long-term control under the drug treatment may elect, the second time, to proceed with the surgical or radioactive iodine alternative. Fortunately, side effects from the administration of the drug PTU are rare. One of the reasons that the drug treatment is so prolonged is that the thyroid-inhibiting drug,

unlike blood pressure regulating drugs or drugs regulating heart rate, for example, does not have speedily determinable results. The thyroid gland has the ability to store its hormone and it takes six weeks to two months to determine what effect a particular dosage is having on the production of the hormone.

With this general discussion of the disease and its treatment, I turn to the facts involved in the treatment of Mrs. Wozniak by Dr. Lipoff.

Patricia Wozniak was hired by Dr. Lipoff to be his medical secretary in his Leavenworth office in June of 1982. In July of 1984, Dr. Lipoff noticed that Mrs. Wozniak had an enlarged thyroid gland (thyromegaly) and bulging eyes (proptosis). Diagnostic tests and laboratory studies were made which revealed Mrs. Wozniak was significantly hyperthyroid. Dr. Lipoff diagnosed the problem as being Graves' disease. Mrs. Wozniak requested Dr. Lipoff, who specializes in internal medicine, to treat her Graves' disease. She started out with a 300 milligrams per day dosage of PTU. In September of 1984, additional tests showed that Mrs. Wozniak was somewhat improved, but still hyperthyroid. The dosage of PTU was increased to 600 milligrams per day. In October of 1984, further testing showed Mrs. Wozniak's thyroid functioning in the euthyroid or normal range, although near the upper limit of the range. November testing was quite similar to the October results.

Shortly after Thanksgiving 1984, Mrs. Wozniak started showing emotional problems in the office—crying spells, being overly anxious, etc. On December 13, 1984, Dr. Lipoff decided that hospitalization was necessary for Mrs. Wozniak's emotional problems and contacted her husband, Gerald Wozniak. They discussed Mrs. Wozniak's increasing psychological problems. As Dr. Lipoff was going to be out of town until December 15, 1984, he asked Mr. Wozniak to watch his wife closely, and to be at the hospital for admittance of Mrs. Wozniak on December 15, 1984. This was accomplished against Mrs. Wozniak's wishes. She was very depressed, anxious, and delusional upon admittance, and Dr. Lipoff admitted her on a diagnosis of paranoid schizophrenia.

Dr. Lipoff concluded a consultation was appropriate and attempted to call in a psychiatrist. This psychiatrist was out of

town, so Dr. Lipoff selected Dr. Frederick Tirrell, a psychologist with whom he had previously discussed Mrs. Wozniak's case on an informal basis.

Thyroid tests made from December 13, 1984, samples revealed her thyroid function was in the low normal range and, out of concern that Mrs. Wozniak might become *hypo*thyroid, Dr. Lipoff reduced her PTU dosage to 300 milligrams per day upon admission. Dr. Lipoff also prescribed Sinequan (an antidepressant drug) and Haldol (an antipsychotic drug) to control her psychiatric symptoms. Dr. Tirrell met with Mrs. Wozniak daily during her hospitalization and conferred with Dr. Lipoff. Dr. Tirrell was in charge of the patient's mental therapy, and Dr. Lipoff remained team captain and in charge of her treatment for Graves' disease. Further thyroid function testing led Dr. Lipoff to believe Mrs. Wozniak was borderline hypothyroid and he temporarily stopped administration of PTU on December 21. Upon her release from the hospital on December 22, she was told to resume PTU on December 24 at 50 milligrams per day. On December 26 or 27, after the receipt of further test results showing low borderline thyroid function, Dr. Lipoff telephoned Mrs. Wozniak and advised her to stop taking PTU. At the time of the telephone call, Mrs. Wozniak had an appointment with Dr. Lipoff scheduled for December 31 where her needs could be reviewed. It should be noted that there was a time delay between the taking of blood samples and obtaining the thyroid function results as the blood samples had to be processed by distant out-of-state laboratories.

For the first few days in the hospital, Mrs. Wozniak showed no improvement psychologically. On December 20, 1984, she exhibited great improvement and was discharged on December 22 with a prescription of 60 pills (100 milligrams each) of Sinequan with instructions to take one at bedtime. Mrs. Wozniak functioned well during the Christmas period but did not resume work for Dr. Lipoff. She did not like the effects of Sinequan (drowsiness, lethargy) and took it irregularly even though her family urged her to take the medication. Dr. Tirrell had agreed to the prescription for Sinequan. Mrs. Wozniak was to see Dr. Tirrell on December 26, but she called and cancelled, stating she was feeling fine. She was to see Dr. Lipoff on December 31,

1984. On December 27, Dr. Tirrell, at his own insistence, saw Mrs. Wozniak. She was unhappy with Dr. Lipoff both as her employer and her physician, and Dr. Tirrell suggested she secure a different physician.

Because of a snowstorm, Dr. Lipoff cancelled his December 31 appointments. Attempts were made to contact Mrs. Wozniak about the cancelled appointment, but she could not be reached. As a result, both she and her husband showed up for the appointment and were quite angry because the physician was not present. Dr. Lipoff called her home that evening and both Wozniaks were quite irate over the missed appointment. Dr. Lipoff tried to make a new appointment, but this suggestion was refused. The next day his staff sought to reschedule, but the Wozniaks refused. Dr. Lipoff never saw Mrs. Wozniak again as a patient.

On January 3, 1985, Dr. Tirrell spoke with the Wozniaks. They were angry over the December 31 appointment missed by Dr. Lipoff. As a result of this conversation, Dr. Tirrell conferred with a Dr. Milgram, a phychiatrist, about seeing Mrs. Wozniak as a patient. Dr. Milgram and Dr. Tirrell agreed that it would be best for her to see an endocrinologist first to determine the status of the patient's Graves' disease. An appointment to see such a specialist, Dr. David Sneid, was set up for the afternoon of January 7, 1985.

On January 4, 1985, Mrs. Wozniak and Craig, her college student son, went to Dr. Lipoff's office to secure her medical records in anticipation of the January 7 appointment with Dr. Sneid. The records had to be photocopied and were not immediately available. Dr. Lipoff talked to Mrs. Wozniak about her decision to see Dr. Sneid. Later that day, an angry Mr. Wozniak came to the office and secured the records.

On January 7, 1985, Mr. and Mrs. Wozniak went to the Sneid appointment. Dr. Sneid carefully explained Graves' disease and the three treatment options. He advised them the disease was controllable. Mrs. Wozniak ruled out surgery but was undecided as between radioactive iodine and drug therapy. She asked thoughtful and appropriate questions. That evening, Mrs. Wozniak seemed more relaxed and happier. Her family urged her to take her Sinequan at bedtime, to which she agreed, but she did

not take the medicine. The following morning she drove one of her children to school and returned home to do housework. Around noon her son Craig left for awhile. At approximately 4:00 p.m., she was found dead—having ingested the remaining pills of Sinequan. The amount was estimated at 55 pills as she had only taken five in the 17-day period she had had the prescription. At no time in the period after her hospitalization had Dr. Tirrell seen her as a suicide risk, nor had Dr. Sneid so viewed her the previous day, although he had been advised she had talked of suicide while hospitalized, and he had, accordingly, been looking for signs thereof. Additional facts will be stated as necessary for the discussion of particular issues.

## MOTIONS FOR A DIRECTED VERDICT

The main thrust of the motions was that the plaintiffs had failed to show that any negligent acts or omissions of defendant had caused or contributed to the suicide of Mrs. Wozniak. I believe this issue has merit and should be dispositive of the appeal.

In *Sampson v. Hunt*, 233 Kan. 572, 578, 665 P.2d 743 (1983), we stated the rules regarding motions for a directed verdict as follows:

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250 the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. *Frevele v. McAloon*, 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977); *Lemley v. Penner*, 230 Kan. 25, 27, 630 P.2d 1086 (1981). The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where that is true, the issue must be submitted to the jury. *Sexsmith v. Union Pacific Railroad Co.*, 209 Kan. 99, Syl. ¶ 3, 495 P.2d 930 (1972). Where no evidence is presented on a particular issue, or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination. *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 411, 580 P.2d 893 (1978); *Southards v. Central Plains Ins. Co.*, 201 Kan. 499, 505, 441 P.2d 808 (1968); *Kemp v. Railway Co.*, 91 Kan. 477, 483, 138 Pac. 621 (1914)."

See *EF Hutton & Co. v. Heim*, 236 Kan. 603, 609, 694 P.2d 445 (1985).

In *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), we discussed the fundamental principles of the law of negligence as follows:

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. See *Marks v. St. Francis Hospital & School of Nursing*, 179 Kan. 268, 270-71, 294 P.2d 258 (1956). An accident which is not reasonably to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, 66 S.E.2d 441 (1951); and Carrington, *Victim's Rights Litigation: A Wave of the Future?*, 11 U. Rich. L. Rev. 447, 461 (1977). In Kansas it is a fundamental rule actionable negligence must be based on a breach of duty. *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, 221, 662 P.2d 243 (1983). See also *Robertson v. City of Topeka*, 231 Kan. 358, 363, 644 P.2d 458 (1982); and *Madison v. Key Work Clothes*, 182 Kan. 186, 192, 318 P.2d 991 (1957). *Robertson v. City of Topeka*, 231 Kan. 358, recognized a special relationship between certain persons could give rise to a duty. Whether a duty exists is a question of law, *McIntosh v. Milano*, 168 N. J. Super. 466, 495, 403 A.2d 500 (1979); *Chesapeake & Pot. Tel. Co. v. Bullock*, 182 Va. 440, 445, 29 S.E.2d 228 (1944); *Tort Law—Duty to Warn—Psychiatrist's Duty to Warn Parties of Dangerous Patients*, 19 Duq. L. Rev. 181, 185 (1980); and Carrington, 11 U. Rich. L. Rev. at 461. Whether the duty has been breached is a question of fact. *Chesapeake & Pot. Tel. Co. v. Bullock*, 182 Va. at 445. Further, whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact. *Stucky v. Johnson*, 213 Kan. 738, 739, 518 P.2d 937 (1974).

"In Kansas negligence is never presumed. *Blackmore v. Auer*, 187 Kan. 434, 440, 357 P.2d 765 (1960). This court in *Blackmore* commented it may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury. 187 Kan. at 440. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself. 187 Kan. at 440. An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation*; it is risk to another or to others within the range of apprehension. *Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), 59 A.L.R. 1253. The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based, 187 Kan. at 441.

"At the center of negligence is the concept of the reasonable person. What would a reasonable and prudent person, confronted by like circumstances and exercising reasonable care, have done? In other words, negligence involves acting other than as a reasonable person would do in the circumstances. The reasonable person has been observed to be the epitome of ordinariness, never reckless or absent-minded, yet neither endowed with exceptional courage, foresight or skill. Mellor, The Law, p. 53 (3rd ed. 1966)." 234 Kan. at 488-89.

We then turned, in *Durflinger,* to a discussion of medical malpractice and the duties of physicians as follows:

"The particular area of the law of negligence with which we are concerned herein is that of medical malpractice. Negligence is an essential element of a medical malpractice action. *Natanson v. Kline,* 187 Kan. 186, 354 P.2d 670 (1960). In *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885 (1976), we summarized the duties of physicians and hospitals as follows:

" 'In *Tefft v. Wilcox,* 6 Kan. 46, 61, this court held that a physician is obligated to his patient under the law to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations. We have continued to impose those duties upon physicians. See PIK, Civil, 15.01 and cases there cited. A physician also has the duty to make a reasonable disclosure to the patient of pertinent facts within his knowledge relating to proposed treatment, in order that the patient may intelligently consent to or refuse the treatment. [Citation omitted.]

" 'Hospitals owe a duty to their patients to exercise reasonable care. This is such care, skill and diligence as the known physical and mental condition of the patient may require, and it is that degree of care used by other hospitals in the community or similar communities under like circumstances. See PIK, Civil, 15.02, and cases therein cited.' 220 Kan. at 375.

"In *Chandler v. Neosho Memorial Hospital,* 223 Kan. 1, 574 P.2d 136 (1977), this court said:

" 'A physician or surgeon is expected to have and to exercise that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities; similarly, a hospital is required to exercise that degree of care, skill and diligence used by hospitals generally in the community or in similar communities under like circumstances. *Avey v. St. Francis Hospital & School of Nursing,* 201 Kan. 687, 442 P.2d 1013, and cases cited therein.' 223 Kan. at 3. See also PIK Civ. 2d 15.01. It should be noted a physician is not a guarantor of good results and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment. *Voss v. Bridwell,* 188 Kan. 643, 364 P.2d 955 (1961); *Goheen v. Graber,* 181 Kan. 107, 309 P.2d 636 (1957).

"Rules of law governing the duty of physicians and surgeons to their patients apply generally to dentists (*Simpson v. Davis,* 219 Kan. 584, 549 P.2d 950 [1976]),

and to registered nurses (*Hiatt v. Groce*, 215 Kan. 14, 523 P.2d 320 [1974]). The duty of a physician to exercise reasonable and ordinary care and diligence remains the same regardless of the particular medical speciality in which the physician practices. However, the particular decisions and acts required of the physician in fulfilling the duty will vary with the circumstances of the patient's situation and the medical speciality of the physician. Obviously such diverse medical specialities as dermatology, radiology, pediatrics, surgery, and psychiatry confront the professional practitioner of each with radically different medical problems. However, what constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine with which the practitioner is involved." 234 Kan. at 489-90.

In order to prevail in a case of medical malpractice, a plaintiff must establish three elements through competent expert medical testimony: (1) a duty owed by the physician to the patient; (2) a breach of that duty; and (3) a causal connection between the breached duty and the injuries sustained by the patient. *Durflinger v. Artiles*, 234 Kan. 484, Syl. ¶ 1; *Webb v. Lungstrum*, 223 Kan. 487, 489-90, 575 P.2d 22 (1978); *Funke v. Fieldman*, 212 Kan. 524, 530, 512 P.2d 539 (1973).

In *Allman v. Holleman*, 233 Kan. 781, 786, 667 P.2d 296 (1983), we said:

"The concept of fault also requires a causal connection between the conduct in question and the injury complained of. A negligent act is the proximate cause of an injury only when the injury is the natural and probable consequence of the wrongful act."

In *Elliott v. Chicago, Rock Island & Pac. Rld. Co.*, 203 Kan. 273, 284, 454 P.2d 124 (1969), we said:

"There are many definitions of the term 'proximate cause,' but one of the most widely quoted defines the proximate cause of an injury to be that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the injury would not have occurred. It has been said the proximate cause of an injury is that which naturally leads to, and which might have been expected to be directly instrumental in, producing the result. In testing whether a negligent act is the proximate cause of an injury it is said the injury is the proximate result of negligence only where the injury is the natural and probable consequence of the wrongful act. Natural and probable consequences are those which human foresight can anticipate because they happen so frequently they may be expected to recur. It has also been said that it must appear the injury was anticipated or that it reasonably should have been foreseen by the person sought to be charged with liability."

The plaintiffs asserted multiple claims of negligence against the defendant physician. It is necessary at this point to discuss

each claim, apply the aforesaid rules, and decide whether a submissible case had been presented on such claim. The simplest way to do this is to state each such claim in the language in which it was ultimately submitted to the jury. The sequence of these claims has been rearranged from that submitted to the jury and as discussed in the majority opinion in order to achieve more chronological continuity.

1. THE DEFENDANT NEGLIGENTLY ENTERED INTO TREATMENT OF A PERSON WHO WAS HIS EMPLOYEE FOR A DISEASE THAT HAD PSYCHOLOGICAL, PSYCHIATRIC, AND EMOTIONAL COMPONENTS, AND WHICH PLACED THE DOCTOR AND PATIENT INTO A CONFLICTING RELATIONSHIP WITH THAT OF EMPLOYER AND EMPLOYEE, AND THIS CONFLICT EVENTUALLY PROVED TO BE A FACTOR IN THE DEATH OF PATRICIA WOZNIAK.

There was no evidence presented that it is negligence for a physician to treat an employee. There was some testimony that it might be better to avoid such a situation, but that such activities are very common among physicians as the employee-patient generally desires it due to his or her confidence in the physician and the convenience of such arrangements.

There was testimony that Mrs. Wozniak's employment duties increased in the fall of 1984 and that she, of necessity, was involved in the training of new personnel in the office. This was stressful for her and Graves' disease patients need an environment with as little stress as possible. In this claim, plaintiffs are attempting to make a medical malpractice claim out of working conditions. This might be likened to a physician treating his wife (contrary to the better practice) and allowing or permitting stress in the home to be used in a claim for malpractice. It is difficult to see how a physician complaining to his patient-wife about a cold dinner or asking her to do an errand for him could constitute medical malpractice by increasing stress on the wife. In any event, there was no expert testimony that the employee-patient relationship with Dr. Lipoff was a cause in the suicide of Mrs. Wozniak.

2. THE DEFENDANT NEGLIGENTLY FAILED TO PROPERLY ADVISE PATRICIA WOZNIAK OR HER FAMILY

CONCERNING THE SYMPTOMS OF GRAVES' DISEASE, THE TREATMENT MODALITIES ACCEPTED FOR THE CONDITION, AND OF THE EXISTENCE OR NONEXISTENCE OF SIDE, EFFECTS FROM THE PROGRAM OF THERAPY.

There was expert testimony that a physician should thoroughly advise the patient about all aspects of Graves' disease, the various treatment modalities, and involve the family where appropriate. Dr. Lipoff's records do not reflect any such explanation was given to her and based solely upon such absence there was expert testimony that this was a breach of a duty owed the patient. Dr. Lipoff testified that he fully explained the disease and treatment options to Mrs. Wozniak and there is corroborating evidence she was provided by him with a pamphlet detailing the disease and its treatment.

Assuming that no such explanation occurred, and that, therefore, a breach of a duty in this regard existed, there was no expert testimony that this was a cause of Mrs. Wozniak's suicide. Dr. Lipoff had discussions with Mr. Wozniak in December 1984 about Mrs. Wozniak's Graves' disease and her mental problems. However, Dr. Tirrell was the man directly responsible for the treatment of her psychological problems. The prescription for Sinequan (for her mental problems) will be discussed in conjunction with another claim. There was no expert evidence that any failure of Dr. Lipoff to discuss Graves' disease, its treatment modalities, etc., with Mr. Wozniak was a breach of a duty which was a cause of Mrs. Wozniak's suicide.

3. THE DEFENDANT FAILED TO FORMULATE AND COMMUNICATE A DEFINITIVE TREATMENT PLAN FOR THE DECEDENT'S CONDITION, DESPITE THE FACT THAT THE REQUIREMENT OF THE DEVELOPMENT OF SUCH A PLAN AND COMMUNICATING IT TO THE PATIENT ON AN   UNDERSTANDABLE BASIS WOULD BE A CRITICAL ELEMENT IN THE SUCCESSFUL TREATMENT OF THIS CONDITION.

Based upon the absence of any reference thereto in Dr. Lipoff's medical records that he developed a treatment plan and discussed it with Mrs. Wozniak, there was expert testimony that this was a breach of a duty. Dr. Lipoff testified he thoroughly

discussed his plan with her and that she accepted it. This is corroborated in a number of ways. For example, shortly after the disease was diagnosed, Mrs. Wozniak stated to her son that her drug therapy would take two years to complete. Dr. Lipoff testified the patient was afraid of surgery and ruled that option out—this was the same response she made to Dr. Sneid on January 7. Treatment of the disease with PTU is an accepted treatment modality. Even assuming that no such discussion occurred, and that, therefore, Dr. Lipoff breached a duty in this regard, there was no expert testimony that this breach was a cause of Mrs. Wozniak's suicide.

4. THE DEFENDANT FAILED TO REFER PATRICIA WOZNIAK TO AN APPROPRIATE CONSULTING PHYSICIAN DESPITE HIS DIFFICULTY IN MANAGING THIS PARTICULAR CASE, AND DESPITE HIS LACK OF EXPERIENCE WITH GRAVES' DISEASE.

There was no expert testimony that it was a breach of a duty for Dr. Lipoff, an internal medicine specialist, to treat Mrs. Wozniak rather than refer her to an endocrinologist. Nor was there any criticism by the experts in his calling in Dr. Tirrell, a psychologist, for the treatment of her mental problems. No submissible case was made on this claim.

5. THE DEFENDANT FAILED TO COMMUNICATE NECESSARY INFORMATION REGARDING THE TREATMENT OF PATRICIA WOZNIAK TO THE CONSULTANT ALTHOUGH THE DEFENDANT KNEW THAT THE CONSULTANT WOULD CONTINUE TO TREAT PATRICIA WOZNIAK.

The claim here is based upon Dr. Lipoff's failure to advise Dr. Tirrell that he had discontinued the drug PTU. There was expert testimony that Dr. Lipoff should have advised Dr. Tirrell that he had discontinued PTU. Dr. Tirrell testified that he told Dr. Lipoff, during the patient's hospitalization, that the Graves' disease should be treated "aggressively." He testified that he was unfamiliar with what "aggressive" treatment of Graves' disease should involve as this was outside his area of expertise.

Dr. Tirrell testified:

"Q.  [By attorney for defendant] Okay. Doctor, was in your opinion—I want to talk about now before the event—was any medical facts available to you or

were any medical facts available to you that in your opinion would be predictive of suicide of Pat Wozniak based upon what you knew then?

"A. Well, actually, it was more based on what I didn't know, which was I presumed that after the hospitalization that she was continuing with PTU and that the Graves' disease was continuing to be treated very aggressively, and I didn't know that it had been discontinued, and when I saw her on the 27th, I didn't ask her, are you still being treated with PTU and so forth, so that certainly—that would be my answer to your question.

"Q. Okay. My question was: Are there any facts that you know of or knew of that would be predictive of suicide for her prior to the event?

"A. Well, as in if I'd known, for instance, that she wasn't taking the PTU, then I would say, well, watch out, she'll commit suicide or something? No, I think even if I['d] known that, I wouldn't have thrown a red flag up and said, whoa, this is terrible.

"Q. Okay. If we assume for the purpose of the question that she was not taking her PTU, you wouldn't have come down to the Leavenworth County Courthouse and tried to commit her?

"A. No, I wouldn't have.

"Q. Okay.

"A. Would have insisted we get going with something, I think."

There was no expert testimony that the failure of Dr. Lipoff to advise Dr. Tirrell of the cessation of PTU was a cause of the suicide of Mrs. Wozniak. The collapse of the relationship between Dr. Lipoff and the Wozniaks after the missed December 31 appointment resulted in Dr. Lipoff not having the opportunity to take additional blood tests and determine if PTU should be resumed. Additionally, when Dr. Sneid, the endocrinologist, saw her on January 7, 1985, he was aware that she had been off PTU for a week to ten days and saw no reason to rush resumption of the medication.

6. THE DEFENDANT FAILED TO GIVE SUFFICIENT WEIGHT AND CONSIDERATION TO THE OPINION OF THE CONSULTANT OBTAINED BY HIM IN THE TREATMENT OF THE DECEDENT.

This claim goes to Dr. Lipoff's failure to treat the Graves' disease "aggressively" as suggested by Dr. Tirrell during Mrs. Wozniak's hospitalization. This was discussed in the preceding claim. There was no expert testimony that Dr. Lipoff deviated from any standard of medical care in failing "to give sufficient weight and consideration to the opinion of" Dr. Tirrell or that such failure had a causal connection to the suicide of Mrs. Wozniak.

7. THE DEMEANOR AND ATTITUDE OF THE DE-
FENDANT AS EXPRESSED THROUGH HIS ACTS AND
STATEMENTS MADE TOWARD THE DECEDENT WERE
IN DIRECT CONTRADICTION AND VIOLATION OF ALL
STANDARDS RELATING TO THE CARE OF THE ENDO-
CRINE CONDITION OF GRAVES' DISEASE AND DI-
RECTLY CONTRIBUTED TO THE DEATH OF PATRICIA
WOZNIAK.

Mrs. Wozniak was upset over the fact that the other patient in
her semi-private hospital room was a terminally ill woman whose
presence bothered her. Additionally, Mrs. Wozniak did not want
to be hospitalized and was a difficult patient. At some point, Dr.
Lipoff may have told her she was "too demanding." Mrs.
Wozniak's son testified that Dr. Lipoff was "rude" when he and
his mother attempted to obtain copies of her medical records to
take to Dr. Sneid. Mrs. Wozniak told Dr. Tirrell that Dr. Lipoff
was aloof and cold in his demeanor toward her. Let us assume all
of this is true (although controverted) and defendant's attitude
and demeanor fell far short of television's Dr. Marcus Welby's
example of physician demeanor. However, there was no expert
testimony that Dr. Lipoff breached any standard of professional
conduct in this regard or that such conduct was a cause of Mrs.
Wozniak's suicide.

8. THE DEFENDANT IGNORED NUMEROUS AND OB-
VIOUS SYMPTOMS AND SIGNS THAT THE DECEDENT
CONTINUED TO SUFFER FROM HER CONDITION OF
GRAVES' DISEASE, AND DISCONTINUED TREATMENT
FOR THAT CONDITION.

There was expert testimony that the six months' treatment of
Mrs. Wozniak's Graves' disease with its rapid drop-off of PTU
had virtually no possibility of effecting a permanent remission of
the disease. Dr. Lipoff did not direct the discontinuation of the
PTU on December 26 or 27 on the belief Mrs. Wozniak was
cured. Rather, he was concerned that, based upon blood tests,
she might be becoming hypothyroid. Mrs. Wozniak had, at the
time, a scheduled appointment with Dr. Lipoff on December 31
where her condition and needs would be evaluated. This was the
missed appointment which triggered the collapse of the physi-
cian-patient relationship. Mrs. Wozniak had, prior to that date,

expressed dissatisfaction with Dr. Lipoff and resentment over his having diagnosed her as a paranoid schizophrenic upon her hospital admission.

There was expert testimony that the rapid dropping of the dosage from 600 milligrams to zero was improper as it could have little likelihood of curing the disease and that a return to hyperthyroidism was almost a certainty. However, blood tests taken a day before Mrs. Wozniak's death revealed that her thyroid function was only mildly elevated over normal levels. There was no expert testimony that the failure to take PTU after hospitalization or that the rapid decrease in the amounts of the medication during hospitalization were a cause of her suicide.

9. THE DEFENDANT NEGLIGENTLY PRESCRIBED A QUANTITY OF A PSYCHOTROPIC DRUG, SOLD UNDER THE BRAND NAME OF SINEQUAN, IN CONTRADICTION AND VIOLATION OF THE ADVICE AND CAUTION OF THE MANUFACTURERS OF THIS DRUG, WHICH DIRECTLY CAUSED THE DEATH OF PATRICIA WOZNIAK.

No expert testified that the mental problems for which Mrs. Wozniak was hospitalized were the sole result of her Graves' disease. At the time of her admission to the hospital and throughout the hospitalization, her test results showed that her thyroid function was within normal limits. There was considerable testimony that depression often occurs in patients with Graves' disease. Yet, no expert stated her extreme anxiety, delusions, etc., were the result of uncontrolled Graves' disease or Dr. Lipoff's treatment of the disease. Rather, there was a separate mental illness in Mrs. Wozniak which was probably aggravated by the presence of the Graves' disease. There was no evidence that her bizarre behavior leading to the hospitalization had anything to do with Dr. Lipoff's treatment of her disease. She was given Haldol and Sinequan in the hospital which resulted in a dramatic improvement in her condition. She was discharged from the hospital on December 22 in quite good spirits, and the family enjoyed a pleasant Christmas. Neither Dr. Tirrell nor any other expert testified that the treatment of the patient with these two drugs during hospitalization was inappropriate.

Prescribing Sinequan at a daily dosage of 100 milligrams as a

take-home medication, was, likewise, not faulted by the experts. The claim herein rests on the number of pills prescribed—60, which was a 60-day supply under the prescription. Sinequan is an antidepressant drug. The manufacturer's insert states:

"Since suicide is an inherent risk in any depressed patient and may remain so until significant improvement has occurred, patients must be closely supervised during the early course of therapy. Prescriptions should be written for the smallest feasible amount."

One of plaintiffs' experts, Dr. Burglass, testified that with a new patient who was thought to be a suicide risk, he thought the lowest feasible amount might be a two-day supply if he was going to see a patient every two days. After he had an opportunity to become more familiar with the patient and evaluate the risk of suicide, he could then, if satisfied, prescribe longer-lasting prescriptions. This witness did not testify the number of pills prescribed for Mrs. Wozniak was improper. This witness testified only as to how he personally prescribed the drug and expressed no opinion on whether Dr. Lipoff had breached any duty of care in prescribing the drug.

The strongest testimony in regard to the number of pills prescribed came from Dr. Kyner, an endocrinologist, who stated:

"Q. [Attorney for plaintiff] Now, Doctor, in this particular case, the prescription was for 60 tablets of Sinequan with an authorization for three refills. In your—

"A. Yes sir.

"Q. In your professional view, is that the smallest feasible amount?

"A. Well, no, you can give a smaller amount.

"Q. All right. And if we excuse that, Doctor, as well as we might, let me add some facts and ask if this would change your opinion at all. If we had a woman who had discussed — whose husband had had a treating physician discuss suicide with him on December 13, who had been hospitalized with all kinds of floride psychiatric sequalia [sic] for a week during December, who had many times in the hospital been described as severely depressed, and, in fact, mentioning suicidal ideations, and who on the 3rd and 4th the treating physician who gave her that prescription as delusional and psychotic, would you view the role and duty of the treating physician in that situation to caution those people around her about that drug for the reason mentioned in the caution by the manufacturer?

"A. Yes.

"MR. GURNEY: Your Honor, I'm going to object. I think that's highly speculative. The factors that he's injected at this time, he's asking him to go back in time and make a determination on all these factors, which the

determination that would have been made by Dr. Lipoff was based probably on a whole assortment of other things that Dr. Kyner isn't in a position to weigh.

"THE COURT: Overruled.

"BY MR. WHITE:

"Q. Your answer was, Doctor?

"A. *Well, I think it's probably true, but I'm not a psychiatrist and I don't know how much was really going on at that point in time.*

"Q. Was your answer yes, Doctor?

"A. Yes.

"Q. All right. Now,—

"A. I qualified it." (Emphasis supplied.)

The only professional seeing Mrs. Wozniak on January 3 or 4 was Dr. Tirrell and he did not view her as being delusional or psychotic. In fact, he saw her as posing no risk of suicide—a position also taken by Dr. Sneid on January 7.

The "lowest feasible amount" is a variable term. Obviously, a prescription of a single pill to be taken in the presence of the prescribing physician is the absolute lowest amount, but is such a prescription feasible when long-term usage is anticipated? Webster's New World Dictionary 511 (2nd College Ed. 1980) defines feasible as "1. capable of being done or carried out; practicable; . . . suitable." Under the rationale of the majority opinion, any time a patient overdoses on Sinequan the prescribing physician is liable, as a smaller number of pills could have been supplied. So, to be on the safe side, the physician should require the patient to visit his or her office each day for a new one-pill prescription. Weekends and holidays presumably would have to be skipped. Such a procedure is hardly feasible. Where a patient is not considered to be a suicide risk, there was no evidence that prescriptions for larger amounts of the drug were a breach of any duty.

No one testified as to what constituted a lethal amount of Sinequan. It is a potent drug—hence the manufacturer's warning. There was no testimony relative to whether 10, 20, or 30 pills would have been lethal. On her visit to Dr. Sneid on January 7, she had her disease and the treatment options fully explained to her. She was told her disease was controllable. Dr. Sneid and Mr. Wozniak testified the patient's mood was uplifted by the Sneid appointment. Mrs. Wozniak was in good spirits that evening and the following morning when she drove her child to

school and did her housework. Neither the professionals involved nor her family had any apprehension or concern of Mrs. Wozniak being a suicide risk on January 8. If the experts have no concern that suicide is a risk for the patient, there is nothing to warn the family of relative to the number of pills prescribed at one time. The lowest feasible amount manufacturer warning relates to how the expert views the patient's mental condition as it pertains to the risk of suicide. Dr. Lipoff did not view Mrs. Wozniak as a suicide risk after her discharge from the hospital, nor did the two other experts who saw her.

I do not believe plaintiffs made a submissible case on any theory. I would reverse the judgment on the ground it was error for the district court to deny defendant's motion for a directed verdict. This issue should be dispositive of the appeal. Inasmuch as the majority has concluded otherwise, a brief discussion of at least one other issue is appropriate.

Even assuming there was enough evidence to submit the case on one or two theories of negligence, the submission of all the other erroneous theories was highly prejudicial to the defendant. The jury was free to pick and choose and could find liability where the necessary three elements of liability never converged in a single theory. As we stated in *Franklin v. Northwest Drilling Co., Inc.*, 215 Kan. 304, 524 P.2d 1194 (1974):

"Here two of three theories of recovery were tried to a jury upon a general verdict with erroneous charges. It seems obvious in this case that the rules as to nonprejudicial error cannot be applied. In fairness and justice we must hold under the circumstances of the case the general verdict cannot be upheld. To hold otherwise would require speculation and conjecture that the general verdict was on the proper theory and not on improper theories." 215 Kan. at 314-15.

I would reverse the judgment herein.

MILLER and HOLMES, JJ., join the foregoing dissent.